

**SCHEEF & STONE**
SOLID COUNSEL

Writer's Direct Dial:
(214) 706-4213

Writer's E-mail:
kelly.crawford@solidcounsel.com

October 11, 2024

**FILED**

OCT 15 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

**Via Overnight Mail**

U.S. District Clerk
U.S. District Court Eastern District of California
Robert T. Matsui Federal Courthouse
501 I Street, Room 4-200
Sacramento, CA 95814

2 24 MC 405 DJC CKD

Re:    *Commodity Futures Trading Commission, et al v. Trader's Domain FX Ltd. d/b/a*
       *The Traders Domain FX LTD, et al., Defendants;* Case No. 24-cv-23745-RKA;
       pending in the United States District Court for the Southern District of Florida,
       Miami Division

## UNSEALED ON OCTOBER 11, 2024

### Filing for Notice Purposes on Miscellaneous Docket

Dear Sir or Madam:

Pursuant to 28 U.S.C. § 754, please find an original and one (1) copy of *Notice of Appointment of Receiver*, with true and correct copies of the *Complaint* filed by the Plaintiffs, Commodity Futures Trading Commission, et al, and the *"Sealed Order Granting Plaintiffs' Expedited Motion for an Ex Parte Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief"* (the "Order Appointing Receiver") attached as exhibits.

The Complaint and the Order Appointing Receiver were unsealed as shown on a copy of the court order that is attached.

Under 28 U.S.C. § 754, a federal receiver appointed in one district may sue in any federal district court and/or be vested with complete jurisdiction and control of all such property in that district. However, Section 754 requires that the Receiver file, within ten (10) days of his/her order of appointment, copies of the complaint and order of appointment in the district court for each district in which the receiver plans to sue or the subject property is located. Based on past experience, these are normally filed as miscellaneous filings. Accordingly, **please file these documents, including this cover letter, and return a file-stamped copy to me via the enclosed self-addressed and prepaid envelope. It is very important that these documents be filed immediately.**

U.S. District Court Eastern District of California
October 11, 2024
Page 2

     Also, please find enclosed a check in the amount of $52 for the necessary filing fee under 28 U.S.C. § 754. Should this fee be inadequate, please file the documents (since there is a short time frame for filing) and contact me regarding the proper fee. I will send the necessary fee immediately. Thank you for your assistance in this matter and please do not hesitate to contact me or my assistant Linda Thompson, at 214.420.4253 should you have any questions.

Sincerely,

Kelly M. Crawford, Receiver

KMC
Enclosures

22384.0102

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-cv-23745-ALTMAN

**COMMODITY FUTURES**
**TRADING COMMISSION,**

    *Plaintiff,*

*v.*

**TRADERS DOMAIN FX LTD.** *d/b/a*
**THE TRADERS DOMAIN,** *et al.,*

    *Defendants.*

_____/

### ORDER

On October 11, 2024, the Plaintiffs filed a Motion to Unseal [ECF No. 11] the docket and

case file this this matter. Being fully advised, we **ORDER AND ADJUDGE** that the Motion [ECF

No. 11] is **GRANTED.** The Clerk of Court is directed to **UNSEAL** this case and all of its docket

entries.

    **DONE AND ORDERED** in the Southern District of Florida on October 11, 2024.

                              **ROY K. ALTMAN**
                              **UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> TRADERS DOMAIN FX LTD. d/b/a THE TRADERS DOMAIN; FREDIRICK TEDDY JOSEPH SAFRANKO a/k/a TED SAFRANKO; DAVID WILLIAM NEGUS-ROMVARI; ARES GLOBAL LTD. d/b/a TRUBLUEFX; ALGO CAPITAL LLC; ALGO FX CAPITAL ADVISOR, LLC n/k/a QUANT5 ADVISOR, LLC; ROBERT COLLAZO, JR.; JUAN HERMAN a/k/a JJ HERMAN; JOHN FORTINI; STEVEN LIKOS; MICHAEL SHANNON SIMS; HOLTON BUGGS, JR.; CENTURION CAPITAL GROUP INC.; ALEJANDRO SANTIESTABAN a/k/a ALEX SANTI; GABRIEL BELTRAN; and ARCHIE RICE, <br><br> Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **MISC. ACTION NO.** <br><br> _____ |

## NOTICE OF APPOINTMENT OF RECEIVER

Pursuant to the provisions of 28 U.S.C. § 754, Kelly Crawford provides notice of his

appointment as Temporary Receiver for Traders Domain FX Ltd. d/b/a The Traders Domain;

Fredirick Teddy Josephy Safranko a/k/a Ted Safranko; David William Negus-Romvari; Ares

Global Ltd. d/b/a Trubluefx; Algo Capital LLC; Algo FX Capital Advisor LLC n/k/a Quant4

Advisor, LLC; Robert Collazo, Jr.; Juan Herman a/k/a JJ Herman; John Fortini; Steven Likos;

Michael Shannon Sims; Holton Buggs, Jr.; Centurion Capital Group Inc.; Alejandro Santiestaban

a/k/a Alex Santi; Gabriel Beltran; Archie Rice (collectively, "Defendants"), and the affiliates or

subsidiaries owned or controlled by Defendants. True and correct copies of the *Complaint* filed by the Plaintiff Commodity Futures Trading Commission, and the *Sealed Order Granting Plaintiff's Expedited Motion for an Ex Parte Statutory Restraining Order, Appointment of a Temporary Receiver, and Other Equitable Relief* are attached hereto as **Exhibit A**, and **Exhibit B** respectively.

October 9, 2024

Respectfully submitted,

*/s/ KellyM. Crawford*
Kelly M. Crawford
Texas State Bar No. 05030700
Kelly.Crawford@solidcounsel.com

Scheef & Stone, L.L.P
500 N. Akard Street, Suite 2700
Dallas, Texas 75201
(214) 706-4200 – Telephone
(214) 706-4242 – Telecopier

# EXHIBIT A

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page 1
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 7 of 152
of 106

**SEALED**

## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

COMMODITY FUTURES
TRADING COMMISSION,

Plaintiff,

v.

TRADERS DOMAIN FX LTD. d/b/a
THE TRADERS DOMAIN; FREDIRICK
TEDDY JOSEPH SAFRANKO a/k/a
TED SAFRANKO; DAVID WILLIAM
NEGUS-ROMVARI; ARES GLOBAL
LTD. d/b/a TRUBLUEFX; ALGO
CAPITAL LLC; ALGO FX CAPITAL
ADVISOR LLC n/k/a QUANT5
ADVISOR, LLC; ROBERT COLLAZO,
JR.; JUAN HERMAN a/k/a JJ HERMAN;
JOHN FORTINI; STEVEN LIKOS;
MICHAEL SHANNON SIMS; HOLTON
BUGGS, JR; CENTURION CAPITAL
GROUP INC.; ALEJANDRO
SANTIESTABAN a/k/a ALEX SANTI;
GABRIEL BELTRAN; and ARCHIE
RICE,

Defendants.

Civil Case No.

FILED BY ___ KP ___ .D.C.

SEP 30 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. · MIAMI

## COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

| | | |
|---|---|---|
| I. | SUMMARY | - 1 - |
| II. | JURISDICTION AND VENUE | - 6 - |
| III. | THE PARTIES | - 7 - |
| | A. Plaintiff | - 7 - |
| | B. Defendants | - 7 - |
| IV. | FACTS | - 11 - |
| | A. The Traders Domain Defendants' Fraudulent Scheme | - 11 - |
| |     a. The TD Defendants Launch an Unregistered Offshore Brokerage and Begin Soliciting Customers | - 11 - |
| |     b. The TD Defendants Begin Soliciting for the TD Pool | - 13 - |
| |     c. The TD Defendants Recruited "Sponsors" to Expand the Scope of the Fraud | - 13 - |
| |     d. The TD Defendants Fraudulently Solicited Customers | - 15 - |
| |         i. The TD Defendants Made Misrepresentations and Omissions Regarding its Trading Operations. | - 15 - |
| |         ii. The TD Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw Their Funds | - 18 - |
| |     e. The TD Defendants Falsified Trading Records | - 23 - |
| |     f. The TD Defendants Misappropriated Customer Funds | - 25 - |
| |     g. Trubluefx Misappropriated Customer Funds. | - 26 - |
| |     h. The TD Defendants Failed to Register with the CFTC | - 27 - |
| |     i. Safranko and Negus-Romvari are Controlling Persons of TD | - 28 - |
| | B. The Algo Defendants' Fraudulent Scheme | - 30 - |
| |     a. Algo Begins Soliciting for the TD Pool | - 30 - |
| |     b. The Algo Defendants Fraudulently Solicited Customers | - 31 - |
| |         i. The Algo Defendants Made Misrepresentations and Omissions Regarding the Operation of the Trading Business | - 31 - |
| |         ii. The Algo Defendants Made Misrepresentations and Omissions Regarding the Location of Customer Funds | - 34 - |
| |         iii. The Algo Defendants Failed to Disclose That TD Was Placed on the RED List | - 35 - |
| |         iv. The Algo Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds | - 37 - |
| |     c. The Algo Defendants Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented | - 40 - |
| |         i. The Algo Defendants Ignored Signs That TD Was Manipulating Trades. | - 40 - |
| |         ii. The Algo Defendants Ignored Public Warnings That TD Was Engaged in Fraud | - 43 - |
| |     d. The Algo Defendants Misappropriated and Commingled Customer Funds. | - 44 - |
| |     e. The Algo Defendants Failed to Register with the CFTC | - 47 - |
| |     f. Collazo and Herman are Controlling Persons of Algo | - 48 - |
| | C. The Sims' Fraudulent Scheme | - 48 - |
| |     a. Sims Fraudulently Solicited Customers | - 49 - |
| |         i. Sims Made Misrepresentations and Omissions Regarding the Ownership and Operation of the Trading Business | - 49 - |

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSB Docket 09/30/2024 Page 3
of 106
Case 2:24-mc-00405-DSC-CRE Document 1 Filed 10/15/24 Page 3 of 152

          ii.    Sims Made Misrepresentations and Omissions Regarding Profit and Risk
- 50 -
          iii.   Sims Made Misrepresentations and Omissions Regarding the Ability of
Customers to Withdraw their Funds ........................................................ - 51 -

    b.    Sims Knew or Should Have Known that TD Was Engaged In Fraud And Not
Trading the Funds As Represented ...................................................................... - 53 -
          i.    Sims Knew or Ignored Signs that TD was Manipulating Trade Data - 53 -
          ii.    Sims Concealed TD Wires and Customer Nationalities................... - 54 -
          iii.   Sims Was Warned about doing Business with TD and Knew or Should
Have Known About Public Warnings About TD ...................................... - 54 -
    c.    Sims Misappropriated Customer Funds................................................... - 55 -
D.    The Buggs' Fraudulent Scheme ............................................................................ - 56 -
    a.    Buggs Begins Soliciting for the TD Pool .................................................. - 56 -
    b.    Buggs Fraudulently Solicited Customers .................................................. - 57 -
          i.    Buggs Made Misrepresentations and Omissions Regarding Profit and
Risk............................................................................................................. - 57 -
          ii.    Buggs Made Misstatements and Omissions About the Trading Operation
- 59 -
          iii.   Buggs Made Misrepresentations About the Ability of Customers to
Withdraw Their Funds................................................................................ - 60 -
    c.    Buggs Knew or Should Have Known That TD Was Not Trading Customer
Funds as Purported.................................................................................................. - 61 -
          i.    Buggs Ignored Warnings That TD was Manipulating Trades ............ - 61 -
          ii.    Buggs Concealed the Purpose of TD Wires and Residency Status of
Customers.................................................................................................... - 62 -
          iii.   Buggs Knew or Should Have Known About Other Public Warnings
About TD .................................................................................................... - 63 -
    d.    Buggs Misappropriated Customer Funds .................................................. - 64 -
E.    The Centurion Defendants' Fraudulent Scheme ................................................. - 66 -
    a.    Centurion Begins Soliciting for the TD Pool ........................................... - 66 -
    b.    The Centurion Defendants Fraudulently Solicited Customers ................. - 67 -
          i.    The Centurion Defendants Made Misrepresentations and Omissions
Regarding Who Controlled Pool Funds..................................................... - 67 -
          ii.    The Centurion Defendants Made Misrepresentations and Omissions
Regarding How the Funds Would Be Traded............................................ - 68 -
          iii.   The Centurion Defendants Made Misrepresentations and Omissions
Regarding the Historical Profits of Their "Hedge Fund" ......................... - 69 -
          iv.   The Centurion Defendants Made Misrepresentations and Omissions
Regarding the Ability of Customers to Withdraw their Funds.................. - 71 -
    c.    The Centurion Defendants Knew or Should Have Known that TD was
Engaged in Fraud and Not Trading the Funds as Purported ................................. - 73 -
          i.    The Centurion Defendants Ignored Evidence that TD was Manipulating
Trade Data ................................................................................................. - 73 -
          ii.    The Centurion Defendants Knew or Should Have Known About Public
Warnings About TD .................................................................................. - 75 -
    d.    The Centurion Defendants Misappropriated and Commingled Customer
Funds  - 75 -
    e.    The Centurion Defendants Failed to Register with the CFTC ................. - 78 -

      f.     Santi and Beltran are Controlling Persons of Centurion ............................ - 79 -

V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS..- 79 -

VI.   RELIEF REQUESTED ..................................................................................................... - 98 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page 5
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 11 of 152
of 106

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.   SUMMARY

1.      From at least November 2019 through present (the "Relevant Period"), Traders Domain FX LTD. d/b/a/ The Traders Domain, by and through its officers, employees, and agents, ("TD") and its co-owners Frederick Teddy Joseph Safranko a/k/a/ Ted Safranko ("Safranko") and David Negus-Romvari ("Negus-Romvari"), individually and as controlling persons of TD (collectively, the "TD Defendants") orchestrated a multi-layered scheme to solicit funds for the purpose of trading leveraged or margined retail commodity transactions, specifically gold-to-U.S. dollar pairs ("XAU/USD"), as well as assorted other commodities, through pooled and individual accounts.  Many, if not all, of the offered leveraged or margined transactions were transactions described in Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D) ("leveraged or margined retail commodity transactions").

2.      Not only did the TD Defendants directly solicit customers, the vast majority of whom lived in the U.S., but they also engaged other individuals and entities ("sponsors") to solicit U.S. customers on TD's behalf—with each sponsor acting like a spoke extending from the TD hub.

3.      During the Relevant Period, the TD Defendants began soliciting individuals and/or entities ("customers") to deposit funds for the purpose of trading XAU/USD and other commodities on a leveraged or margined basis through various account offerings.  Starting in January 2021 and continuing thereafter, the TD Defendants also solicited customers for the specific purpose of participating in commodity pool operated by TD (the "TD Pool").  The TD Defendants committed fraud by knowingly or with reckless disregard making oral and written

- 1 -

COMPLAINT FOR INJUNCTIVE RELIEF. CIVIL MONETARY PENALTIES. RESTITUTION. AND OTHER

fraudulent and material misrepresentations and omissions, including through the TD website, *thetradersdomain.com*, on social media, via text messages, email, newsletters, and/or in person in order to persuade potential and existing customers to transfer funds for the purpose of trading XAU/USD either through TD's various account offerings or via the TD Pool. TD misappropriated customer funds by accepting customer money via third party bank accounts, payment processors, and crypto wallets, but failing to use at least some of those funds to trade XAU/USD and by charging commissions on purported trading profits that did not exist. In addition, TD, and later it's successor in interest Ares Global d/b/a/ Trubluefx ("Trubluefx"), misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts. TD and Safranko also falsified trading records, and the TD Defendants failed to register as required under the Act.

4.     In an effort to expand the scope of the fraud, the TD Defendants recruited entities and individuals to act as sponsors and solicit new customers in exchange for a percentage of purported trading profits in a manner akin to a multi-level marketing ("MLM") scheme. In addition to the many sponsors spread all over the United States and internationally, the TD Defendants recruited the "Sponsor Defendants" (collectively with the TD Defendants and Trubluefx, "Defendants"), four distinct groups named in this complaint which drove the largest number of customers and funds to the TD Pool: (i) Algo Capital LLC ("Algo Capital") and Algo FX Capital Advisor, LLC ("Algo FX"), now known as Quant5 Advisor, LLC, by and through their officers, employees, and agents (collectively, "Algo"), Robert Collazo, Jr. ("Collazo"), Juan Herman ("Herman"), John Fortini ("Fortini"), and Stephen Likos (Likos) (collectively, the "Algo Defendants"); (ii) Michael Shannon Sims ("Sims"); (iii) Holton Buggs ("Buggs"); and (iv) Centurion Capital Group, Inc., by and through its officers, employees, and agents

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page 7
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 13 of 152
of 106

("Centurion"), Alejandro Santiestaban a/k/a Alex Santi ("Santi"), Gabriel Beltran ("Beltran"), and Archie Rice ("Rice") (collectively, the "Centurion Defendants").

5.      As set forth below, each group of Sponsor Defendants engaged in a separate fraudulent scheme to solicit customers for the purpose of trading leveraged or margined XAU/USD. Although the Sponsor Defendants each intended the funds they solicited from customers to be traded in the TD Pool, at least some Sponsor Defendants purported to be soliciting for their own pools or "hedge funds." The Sponsor Defendants solicited funds for the TD Pool even though each knew or should have known that TD was *not* trading the funds as represented. Each of the Sponsor Defendants became aware of red flags that put them on notice that TD was not a legitimate trading operation. The Sponsor Defendants faced a choice: cease promoting TD in light of the alarming information they knew or follow the strong financial motivations they had to ignore the red flags and continue to collect generous commissions on the purported trading. Each of the Sponsor Defendants chose the latter. The Sponsor Defendants actively downplayed the red flags and continued to solicit customers, helping to create the false impression that customers were participating in legitimate trading even as the scheme was on the brink of collapse.

6.      Each of Sponsor Defendants knowingly made oral and written fraudulent and material misrepresentations and omissions on social media, via text messages, by telephone, and in person to potential and existing customers that they knew or should have known were false. The Sponsor Defendants misappropriated customer funds, including by accepting funds intended for trading into bank accounts they controlled and/or collecting commissions on customer profits despite that the Sponsor Defendants knew or should have known that TD was not trading the

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page 8
Case 2:24-mc-00465-DJC-CRP Document 1 Filed 10/13/24 Page 14 of 152
of 106

funds as purported. Some of the Sponsor Defendants also commingled customer funds and most were not registered as required under the Act.

7.     In the fall of 2022, the scheme began to unravel, and customers began to experience extreme withdrawal delays and/or were unable to withdraw their funds. To persuade customers that the withdrawal issues were not an indication of fraud, the TD Defendants provided numerous, conflicting excuses for the delays—including, in June 2023, announcing that TD had been acquired by Trubluefx. The TD Defendants falsely assured customers that their funds were safe and withdrawals would be processed. Notwithstanding the significant withdrawal delays, the Sponsor Defendants ignored or downplayed the withdrawal issues and continued to solicit funds from new and existing customers to be traded in the TD Pool. These misstatements allowed Defendants to continue their fraudulent scheme for more than six months and bilk customers out of millions of additional dollars.

8.     Each defendant knowingly or with reckless disregard for the truth engaged in the fraudulent scheme.

9.     By virtue of this conduct and the conduct described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices that violate the following provisions of the Act and Regulations:

### a. The TD Defendants and Trubluefx
   i.   TD, Safranko, Negus-Romvari, and Trubluefx violated Sections 4b(a)(2)(A),(C), 4$o$(1)(A)–(B), and 4k(2) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C), 6$o$(1)(A)–(B), and 6k(2);
   ii.  TD and Safranko violated 7 U.S.C. § 6b(a)(2)(B); and
   iii. TD violated Sections 4m(1) of the Act, 7 U.S.C. § 6m(1).

### b. The Algo Defendants
   i.   Algo Capital, Algo FX, Collazo, Herman Fortini and Likos violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6$o$(1)(A)–(B), and 6k(2);
   ii.  Algo Capital violated 7 U.S.C. § 6m(1); and

- 4 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page 9
Case 2:24-mc-00465-DJC-CRD Document 1 Filed 10/15/24 Page 15 of 152
of 106

        iii.  Algo Capital and Algo FX violated Regulation 4.20(a)(1), (b)–(c), 17
             C.F.R. § 4.20(a)(1), (b)–(c) (2023).

   c. **Sims**
      i.  Sims violated 7 U.S.C. §§ 6b(a)(2)(A),(C).

   d. **Buggs**
      i.  Buggs violated 7 U.S.C. §§ 6b(a)(2)(A),(C).

   e. **The Centurion Defendants**
      i.  Centurion, Santi, Beltran, and Rice violated 7 U.S.C. §§
          6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);
      ii.  Centurion violated 7 U.S.C. § 6m(1); and
     iii.  Centurion violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

10.     Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation

1.2, 17 C.F.R. § 1.2 (2023), an entity, as a principal, is liable for the acts of its agents,

employees, or officers committed within the scope of their agency, employment or office. At all

relevant times, (i) Safranko and Negus-Romvari's acts were committed within the scope of their

employment, agency, or office with TD; therefore, TD is liable as principal for Safranko and

Negus-Romvari's violations of the Act and Regulations; (ii) Collazo, Herman, Fortini, and

Likos's acts were committed within the scope of their employment, agency, or office with Algo

Capital and Algo FX; therefore, Algo Capital and Algo FX are liable as principals for Collazo,

Herman, Fortini, and Likos's violations of the Act and Regulations; (iii) Santi, Beltran, and

Rice's acts were committed within the scope of their employment, agency, or office with

Centurion; therefore, Centurion is liable as a principal for Santi, Beltran, and Rice's violations of

the Act and Regulations.

11.     Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), an individual is liable for

the acts of an entity which it directly or indirectly controls provided the individual knowingly

induced the underlying violations of the act or failed to act in good faith. At all relevant times:

(1) Safranko and Negus-Romvari controlled TD and knowingly induced the underlying

- 5 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page 16 of 152
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 16 of 106
10 of 106

violations or failed to act in good faith and, therefore, Safranko and Negus-Romvari are liable as
controlling persons for TD's violations of the Act and Regulations; (2) Collazo and Herman
controlled Algo Capital and Algo FX and knowingly induced the underlying violations or failed
to act in good faith and, therefore, Collazo and Herman are liable as controlling persons for Algo
Capital and Algo FX's violations of the Act and Regulations; and (3) Santi and Beltran
controlled Centurion and induced the underlying violations or failed to act in good faith and,
therefore, Santi and Beltran are liable as controlling persons for Centurion's violations of the Act
and Regulations.

12. At least some of Defendants' conduct is ongoing—upon information and belief,
the majority of customer funds have not been returned. Unless restrained and enjoined by this
Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint
and similar acts and practices, as described below.

13. Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7
U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their
compliance with the Act and the Regulations promulgated thereunder. In addition, the CFTC
seeks civil monetary penalties, restitution, and remedial ancillary relief, including, but not
limited to, trading and registration bans, disgorgement, rescission, pre- and post-judgment
interest, and such other and further relief as the Court may deem necessary or appropriate.

## II. JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal
question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original
jurisdiction over civil actions commenced by the United States or by any agency expressly
authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1,

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

15.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside in, transact, or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District. Venue also properly lies as to the alien defendants pursuant to 28 U.S.C. § 1391(c)(3).

## III.    THE PARTIES

### A. PLAINTIFF

16.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1–26, and the CFTC's Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2023).

### B. DEFENDANTS

17.     Defendant **Traders Domain FX LTD. d/b/a The Traders Domain ("TD")** is an International Business Company formed in 2017 under the laws of St. Vincent and the Grenadines that has its principal operations in Canada. TD was co-founded by Safranko and Negus-Romvari who, during the Relevant Period, acted as directors of TD. TD has never been registered with the CFTC. On July 14, 2022, the CFTC issued a press release notifying the public that TD, among other entities, had been added to its RED List (Registration Deficiency), and explicitly cautioned U.S. customers against doing business with those entities.

- 7 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

18.     Defendant **Fredrick Teddy Joseph Safranko, a/k/a Ted Safranko,** is a resident of Ontario or British Columbia, Canada. During the Relevant Period, Safranko was a co-founder, director, and CEO of TD. Safranko referred to himself and was known on various social media platforms as "Uncle Ted." Since August 2020, Safranko has been an approved Principal of Utah based SAEG Capital General Management LP ("SAEG"). On January 31, 2023, SAEG and Safranko were sued by the Commission in the District Court for the Southern District of Texas for making false statements to the National Futures Association ("NFA") in violation of Section 9a(4) of the Act, 7 U.S.C. § 13(a)(4). On September 5, 2023, the court entered an order of default judgment against SAEG and Safranko finding that they violated 7 U.S.C. § 13(a)(4) and imposing relief, including a permanent injunction, trading and registration bands, and a civil monetary penalty. Safranko has never been registered with the CFTC in any other capacity.

19.     Defendant **David William Negus-Romvari** is a resident of Ontario, Canada and Mexico. During the Relevant Period, Negus-Romvari was a co-founder and director of TD. Since September 2020, Negus-Romvari has been an approved Principal of SAEG. Negus-Romvari has never been registered with the CFTC in any other capacity.

20.     Defendant **Ares Global Ltd. d/b/a Trubluefx** is a limited liability company incorporated in Saint Lucia in June 2023. Beginning in June 2023, Trubluefx assumed all business operations of TD, including taking control of customer accounts, communicating with customers, and purportedly trading customer funds. Trubluefx has the same registration address in St. Vincent and the Grenadines that was previously used by TD. Trubluefx has never been registered with the CFTC.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
13 of 106
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 19 of 152

21.     Defendant **Algo Capital LLC** is a limited liability company incorporated in the state of Florida in 2018. It has a business address of Miami, Florida. Algo Capital has never been registered with the CFTC.

22.     Defendant **Algo FX Capital Advisor LLC n/k/a Quant5 Advisor, LLC** is a limited liability company incorporated in the state of Delaware in August 2021. It has a business address of Medley, Florida. In or around September 2022, Algo FX changed its name to Quant5 Advisor, LLC ("Quant5"). Algo FX n/k/a Quant5 was registered with the CFTC as a Commodity Pool Operator ("CPO") and a Commodity Trading Advisor ("CTA") from April 20, 2022 to March 24, 2023. During the Relevant Period, Algo Capital and Algo FX shared some of the same employees. The Algo Defendants used both Algo entities interchangeably to solicit customers for the same commodity pool and deposited pool funds into the same bank accounts held in the name of Algo Capital, which were controlled by Collazo and Herman.

23.     Defendant **Robert Collazo, Jr.** is a resident of Miami Lakes, Florida. During the Relevant Period, Collazo was the President of Algo Capital and a Manager and owner of Algo FX. Collazo has never been registered with the CFTC.

24.     Defendant **Juan Jose Herman a/k/a/ JJ Herman** is a resident of Miami, Florida. During the Relevant Period, Herman was the Vice President of Algo Capital and a Manager and owner of Algo FX. On August 29, 2022, Herman filed an application with NFA to be listed as a Principal for Quant5, but he withdrew that application on November 28, 2022. Herman has never been registered with the CFTC in any other capacity.

25.     Defendant **John Fortini** is a resident of North Miami, Florida. During the Relevant Period, Fortini was Vice President and the CFO Portfolio Management of Algo Capital and Algo FX. Fortini has never been registered with the CFTC.

- 9 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRD Document 1 Filed 10/15/24 Page 20 of 152 Page
14 of 106

26.     Defendant **Stephen Likos** is a resident of Sunny Isles Beach, Florida. During the Relevant Period, Likos was a sales representative for Algo Capital and Algo FX, and he received commissions based on the customers that he solicited for Algo. Likos has never been registered with the CFTC.

27.     Defendant **Michael Shannon Sims** is a resident of Sunny Isles Beach, Florida. From January 24, 2020 to April 8, 2023, Sims was an approved Principal of an entity registered with the CFTC as a commodity pool ("CPO") operator and commodity trading advisor. Sims has never been registered with the CFTC in any other capacity. On January 31, 2023, in the same suit against Safranko, the Commission sued Sims for aiding and abetting fraudulent conduct by another defendant in violation of Section 4b(a)(2) and 4$o$ of the Act, 7 U.S.C. §§ 6b(a)(2) and 6$o$ and Commission Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2023). This case is on-going.

28.     Defendant **Holton Buggs, Jr.** is a resident of Houston, Texas. Buggs has never been registered with the CFTC.

29.     Defendant **Centurion Capital Group Inc.** is a company incorporated in the state of Florida in March 2022 with its principal office in Hiahleah Gardens, Florida. Centurion has never been registered with the CFTC.

30.     Defendant **Alejandro Santiestaban a/k/a Alex Santi** is a resident of Hialeah, Florida. Santi owns Centurion Holdings LLC ("CH"), a limited liability company incorporated in the state of Delaware. CH is listed on Centurion's registration documents as its President. Upon information and belief, CH is a holding company through which Santi controls Centurion. Santi has never been registered with the CFTC.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 21 of 152
15 of 106

31.    Defendant **Gabriel Beltran** is a resident of Hialeah, Florida. Beltran owns GMJ Marketing LLC ("GMJ"), a limited liability company incorporated in the state of Florida. GMJ is listed on Centurion's registration documents as its Vice President. Upon information and belief, GMJ is a holding company through which Beltran controls Centurion. Beltran has never been registered with the CFTC.

32.    Defendant **Archie Rice** is a resident of Fulshear, Texas. During the Relevant Period, Rice solicited customers on behalf of and as a representative of Centurion, including on at least one occasion meeting with a prospective customer in-person in Florida. Rice has never been registered with the CFTC.

## IV.    FACTS

### A. THE TRADERS DOMAIN DEFENDANTS' FRAUDULENT SCHEME

33.    During the Relevant Period, TD and its co-owners Safranko and Negus-Romvari fraudulently solicited U.S. customers to deposit money for the purpose of trading XAU/USD, through individual accounts, copy trading accounts, and later participating in the TD Pool by making material misrepresentations and omissions to prospective and actual customers. In addition, TD and its successor in interest, Trubluefx, misappropriated customer funds, TD and Safranko falsified trading records; and the TD Defendants failed to register as required under the Act. Pursuant to this scheme, at least 2,046 customers deposited no less than $283 million for the purpose of participating in the TD Pool, as well as assorted other commodities, through pooled and individual accounts.

### a.    The TD Defendants Launch an Unregistered Offshore Brokerage and Begin Soliciting Customers

34.    In October 2017, TD was incorporated in St. Vincent and the Grenadines and, upon information and belief, Safranko and Negus-Romvari appointed themselves directors and

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 22 of 152
16 of 106

sole shareholders. Shortly thereafter, in December 2017, TD teased the launch of its retail

brokerage via the Instagram handle @thetradersdomain. On December 31, 2017, TD announced

on Instagram: **"\*\*\*\*THE TRADERS DOMAIN RETAIL BROKERAGE SITE LAUNCH

FRIDAY JANUARY 5TH \*\*\*\*"** and posted a video advertising the various features of the

brokerage site. The video indicated that TD was "Built by Traders for Traders" and boasted a

"Renowned and Trusted Broker and Community." The post directed people to its website,

www.thetradersdomain.com.



35.     As early as 2018, the Traders Domain website, www.thetradersdomain.com,

highlighted key features of the brokerage, including: "Client segregated accounts," "Reputable

payment gateway providers," "Rapid withdrawal and deposits," "Industry Leading Execution,"

and "Desirable leverage from 1:500."

36.     In addition to offering trading accounts through which customers could trade their

own funds, since at least January 2020, TD also solicited U.S. customers for the purpose of

trading XAU/USD, both of which are commodities, and other commodities through investment

style accounts that did not require customers to actively trade their own funds. One type of

investment account offered by TD was a "Percentage Allocation Management Model ("PAMM")

account—a form of pooled trading whereby the trader executes trades on behalf of all

- 12 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 23 of 152
17 of 106

participants and profits are distributed proportionately to all participants based on their share of the pool. TD also advertised "copy trading" services which purportedly allowed customers to automate trading in their account by copying the trades done by a variety of "master traders," including Safranko.

37.     During this initial period, TD solicited customers for these PAMM and/or "copy trading" offerings through representations it made on website and social media accounts, which falsely claimed that TD was a "registered and licensed brokerage firm" that did not accept U.S. customers.

### b. The TD Defendants Begin Soliciting for the TD Pool

38.     Upon information and belief, in or around January 2021, TD began to solicit potential customers for the express purpose "subscribing" or participating in the TD Pool—*i.e.* one or more PAMM-style accounts that purported to trade exclusively leveraged or margined XAU/USD and, upon information and belief, were controlled and traded by Safranko. The TD Defendants and customers described the TD Pool at various times as the "High-Risk PAMM" or "Gold PAMM" account.

39.     Upon information and belief, TD advertised that the TD Pool generated returns of more than 5,000% in 2021 and 7,000% in 2022.

40.     TD also told customers that they could set a risk limit on their PAMM account to protect against losses to their initial investment and earned profit.

### c. The TD Defendants Recruited "Sponsors" to Expand the Scope of the Fraud

41.     Since its inception, TD offered traders the opportunity to earn "affiliate commissions" and "bonus payments" based upon the monthly volume introduced to the platform through its "Introducing Broker" or "Partner Program." TD made these commissions and bonus payments to its partners by crediting their TD accounts. In December 2021, TD posted about its

- 13 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 24 of 152
18 of 106

"Referral Program" on Instagram encouraging users to "Tell A Friend" and "Earn Rebates" from their trading.



42.     In or around January 2021, the TD Defendants began to take additional steps to actively recruit new "Partners" or "Sponsors" for the purpose of driving new customers to the TD Pool. The TD Defendants recruited U.S. individuals and/or entities—many of whom had established social media followings, MLM networks, or other clientele—to act as sponsors and solicit new U.S. customers for the TD Pool in exchange for a portion of purported trading revenues. TD compensated sponsors for recruiting customers by paying them commissions—sometimes as high as 60 percent of customers' purported trading profits.

43.     For example, in March 2022, Negus-Romvari attended a meeting in Miami, Florida with sponsors and potential sponsors, including representatives of Algo and Centurion. As described further below in ¶ 55, following the meeting, Negus-Romvari continued to communicate with Centurion through Santi, Beltran, and Rice for the purpose of encouraging them to solicit customers for the TD Pool.

44.     On multiple occasions, including on or around April 11, 2022, Safranko and other representatives of TD held meetings with some or all of the Algo Defendants in or around

- 14 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 25 of 152
19 of 106

Miami, Florida. Throughout the Relevant Period, Safranko communicated with the Algo

Defendants thousands of times by telephone, video conference, text message, and through other

messaging apps.

45.　　Safranko also established relationships with other sponsors, including Sims and

Buggs. Safranko communicated with Sims and Buggs via telephone and/or messaging

applications. Additionally, on a number of occasions, Safranko participated in telephone and

video conferences with potential or existing customers that Buggs was soliciting. On at least one

occasion, Safranko traveled with Buggs to Dubai in connection with TD. Like the other Sponsor

Defendants, the TD Defendants paid Buggs and Sims commissions based on the customers that

they recruited for the TD Pool.

### d. The TD Defendants Fraudulently Solicited Customers

46.　　During the Relevant Period, the TD Defendants fraudulently solicited prospective

U.S. customers to deposit money for the purpose of trading leveraged or margined XAU/USD or

other commodities. The TD Defendants made numerous fraudulent misrepresentations and

omissions regarding, among other things, (i) its trading operations and (ii) the ability of

customers to withdraw their funds.

> i.　*The TD Defendants Made Misrepresentations and Omissions*
> *Regarding its Trading Operations*

47.　　TD made numerous representations about the trading of customer funds leading

customers to believe that all of the funds they directed to PAMM accounts, "copy trading"

accounts, and/or the TD Pool were being used to trade leveraged or margined XAU/USD. In

addition, Negus-Romvari also made misrepresentations that TD was utilizing a "bot" or "algo" to

trade customer funds.

- 15 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
20 of 106
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 26 of 132 Page

48.     Safranko made fraudulent misrepresentations by telling at least some customers that all funds deposited for the purpose of participating in the TD Pool would be used to trade leveraged or margined XAU/USD. Safranko made these misrepresentations while pitching the success of the TD pool to potential customers.

49.     In addition, TD's account setup instructions, account activity provided to customers via a trading application, daily confirmation statements, and TD newsletters, all led customers to believe that their funds would be used to trade leveraged or margined XAU/USD using a PAMM, "copy trading" accounts, and/or the TD Pool.

50.     On its website, www.thetradersdomain.com, TD provided instructions and video tutorials on how to create an account and subscribe to TD's PAMM account. One sponsor provided similar instructions in a nine-page document titled "HOW TO—Become TD Client & Subscribe to Trade Copying Service" the contents of which, on information and belief were provided by TD. TD described in detail the steps a customer needed to take in order to participate in the TD Pool—including, creating a TD profile, opening an investment account, setting up a subscription to the Master Account ("MetaTrader 5 High Risk PAMM"), and funding their investment. The account setup document describes how "the account can be funded and investment subscribed to trading copy services, to generate generous returns." The account setup document further provides the misleading impression that all funds would be traded by warning that "trading can result in the loss of 100% of your capital."

51.     If customers deposited funds for the purpose of participating in the PAMM accounts, "copy trading" accounts, or TD Pool (via one of the methods described below at Part IV.A.f.), they were directed to download a trading application (the "Trading App"). Customers could purportedly view and monitor the trading activity in their TD trading account, but they did

- 16 -

not have the ability to make trades or withdraw funds. Through the Trading App customers observed that all of the funds intended for trading were available in their TD Account often within 48 hours of a deposit. For example, one customer wired his funds at TD's direction to a third-party bank account in the U.S. His TD account showed that it was credited with the full wire balance that same day and began "trading" the following day.

52.     Customers also received daily confirmation trading statements by email and through the Trading App showing the trading activity in their accounts. The daily confirmation statements showed the purported trades that day, and the customer's account balance less the TD commission.

53.     TD also periodically sent customers a newsletter, updating customers about issues and plans. In these newsletters and other customer communications TD created the misleading impression that all customer funds were being traded and that trade orders were being executed in the market, by warning customers that their funds were "at full risk anytime during trading" as well as describing its plans to improve order execution.

54.     In addition to misrepresenting that TD was trading all customer funds, TD also made misleading statements regarding how customer funds were being traded.

55.     For example, in the Spring and Summer of 2022, Negus-Romvari engaged in numerous conversations with the Centurion Defendants over text messages and Zoom. During those conversations Negus-Romvari shared a link purporting to show the trading results for "1+ year of the algo." Among other things, the results purportedly showed monthly gains of 15% for a "conservative" account, which, Negus Romvari explained, had a "40% lower risk profile." Thereafter, the Centurion Defendants solicited funds from customers for the purpose of trading leveraged or margined XAU/USD using the "bot" or "Algo" Negus-Romvari had described.

- 17 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 28 of 152
22 of 106

56.     The statements set out in ¶¶ 47-55 were false. First, TD did not utilize an algorithm or "bot" to trade funds in the TD Pool. Upon information and belief, Safranko was responsible for manually trading funds in the TD Pool. Second, these statements created the misleading impression that all customer funds were used to trade leveraged or margined XAU/USD. In fact, only a fraction, if any, of the funds deposited for the purpose of participating in the TD were actually traded. As set forth in detail below in Part IV.A.f., although customers were led to believe that they were funding their TD accounts through a variety of methods, customer funds were diverted and misappropriated in a variety of ways without ever being sent to fund a trading account.

                    ii.     *The TD Defendants Made Misrepresentations and Omissions*
                            *Regarding the Ability of Customers to Withdraw Their Funds*

57.     Beginning in August 2022, TD began to experience "liquidity problems" and was unable to fulfill customer withdrawal requests. Rather than provide truthful information to these customers about their funds, the TD Defendants lied to customers about the purported reasons for the delays and offered false assurances that withdrawals would be processed. The TD Defendants made these statements via a variety of channels, including email, TD Newsletters, text messages, Telegram, on videoconferences, and in-person. In fact, upon information and belief, the TD Defendants lacked the funds to repay their customers, because customer funds had been misappropriated and not traded as purported, and the scheme was on the brink of collapse.

58.     For example, on August 4, 2022, Negus-Romvari advised the Centurion Defendants that they were "requesting many withdrawals consitently [sic]" and as a result they would be "processed in a queue" and could take "20 days to a month to process." Negus-Romvari explained that the TD Pool was "not an ATM" and that it was normal in the "highest

- 18 -

level of finance" for "[h]edge funds . . . the best ones" to "lock funds including profits for months/sometimes years."

59.    On August 31, 2022, TD announced an "adjustment in [the withdrawal] timelines" to all of its customer in the first edition of the "TD Newsletter." The Newsletter stated: "Currently, we are working to have all withdrawals completed **within 20 business days**," (emphasis added) explaining that all withdrawals must "go through a screening process that includes our compliance area where we must review the entire trade history."

60.    TD also advised some customers and sponsors that, in or around August 2022, TD had lost its banking relationships as a result of customers submitting withdrawal requests with incorrect wire information.

61.    These statements were false. The withdrawal delays were not caused by TD's compliance screening process or the loss of its screening process. Rather, TD was unable to fulfill customer withdrawals because, upon information and belief, its scheme was on the brink of collapse. Nor did TD process pending delays within 20 days or a month as promised. Customers continue to be unable to withdrawal their funds more than two years after the timeline adjustment was announced.

62.    In or around October 2022, after announcing that TD had established a new banking relationship, TD introduced a cryptocurrency payment processing firm based in Utah ("Crypto Payment Processing Firm") to act as the interface between the bank and TD customers for the purpose of handling wire transfer, ACH, and certain cryptocurrency withdrawals. TD told customers that the Crypto Payment Processing Firm would allow TD to "expand our processing capabilities" and provide payments "faster than our current 20 business day period."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

63.     These statements were also false.  Crypto Payment Processing Firm did not fix any of the withdrawal issues which were the result of the fact that TD had misappropriated customer funds and did not trade them as purported.  Upon information and belief, the majority of TD customers were unable to withdraw their customer funds from their accounts via Crypto Payment Processing Firm.

64.     On December 11, 2022, TD sent another edition of its "Newsletter" titled "2022 Wrap Up" to its customer base.  TD set forth yet another new timeframe for purported withdrawals specifically for customers participating in the TD Pool.  TD stated that "All clients who use the High-Risk PAMM section will now be restricted in terms of withdrawal processing to **1 withdrawal per 45 business days and the withdrawal will be processed within this time frame.  The longest the withdrawal will take with this policy will be 45 business days."** (emphasis added).

65.     As the withdrawal timeframes continued to change, so did the excuses.  During a December 2022 video conference, Safranko told Santi and certain customers that customer withdrawals were being held up by banking issues.  Nevertheless, Safranko promised that their pending withdrawals would be fulfilled by January 31, 2023.

66.     In or around December 29, 2022, TD posted an "Update" on the Dashboard of the Trading App:

> Seasons greetings to all of The Traders Domain Clients.  We are pleased to announce that we have updated our banking channels so we are able to move funds quicker and outstanding transactions will be cleared shortly.  We appreciate the patience and apologize for the delay.  Please also note that the timelines that were provided in the newsletter are just temporary until we stress test our current banking vehicles.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 31 of 152
25 of 106

67.     Safranko also held multiple video and in-person meetings with customers where he made misstatements and provided additional false assurances that withdrawals would be paid imminently. For example, on or around January 9, 2023, Safranko held a video meeting with a number of customers. During this meeting, Safranko showed the customers documents that he claimed proved that TD was a legitimate business and had funds to repay all outstanding withdrawals. These documents included a December 8, 2022 letter from a Financial Services Company based in UAE purporting to hold $150 million for TD and an August 24, 2022 "audit report" from a Mexican accounting firm purporting to show that TD had net revenue of $500 million in 2022.

68.     Shortly thereafter, on or around January 19, 2023, Safranko held an in-person meeting in Vancouver, British Columbia with two customers. During the meeting, Safranko showed additional documents that purportedly showed that TD had the funds to repay all outstanding withdrawals. However, when these customers asked Safranko to log in to certain accounts to demonstrate proof of funds, he refused to do so. Safranko promised to provide additional documents and proof in a follow-up meeting, but that meeting never materialized. Safranko eventually ceased all communication with these customers without providing the additional documents and proof.

69.     Throughout late winter and spring 2023, TD continued to communicate with customers about delays in withdrawals. On February 6, 2023, TD sent another Newsletter to clients stating that "there continues to be improvement on distributions and timing." The Newsletter blamed the delays on the rapid growth of the High-Risk PAMM account: "In the span of 6 months, Traders Domain has grown by 30%" specifically "in the High Risk PAMM section" and the " the additional users . . . created strain on our processing system."

- 21 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 32 of 152
26 of 106

70.     Despite these significant withdrawal delays, as recently as March 2023—more than seven months after TD's purported liquidity problems started—TD's website still promised customers that they could access their funds via "Fast Withdrawals."

71.     These statements were also false. Upon information and belief, the withdrawal delays were not caused by strain on TD's processing system cause or the need to "stress test" TD's compliance screening process. Rather, TD was unable to fulfill customer withdrawals because its scheme was on the brink of collapse. Contrary to Safranko's assurances, TD did not have the funds to pay all pending withdrawal requests. Nor were the increased withdrawal timelines "temporary." TD did not meet the updated 45-day withdrawal timeline or comply with any of the other promised deadlines. Customers continue to be unable to withdrawal their funds more than two years after the timeline adjustment was announced.

72.     On March 21, 2023, TD announced in a newsletter that TD was allegedly being acquired, but that **"WITHDRAWALS WILL CONTINUE TO PROCESS."** (emphasis in original) TD explained that "This acquisition allows for more choice for processing and banking which allows for faster transaction both in and out of the brokerage"

73.     On June 13, 2023, TD sent its "Final Newsletter" which stated that the transition to the new platform would be completed that week and any future communications would be from the "new brokerage platform." TD assured its clients that pool funds would be transferred to the new brokerage:

> In terms of the PAMM system, you all were subscribed to, you will have access to that feature once again to move funds out of your investment account for withdrawals. The subscription feature will be automatically enabled. If you do not wish to have your account subscribed, you will have 48 hours to unsubscribe your account, so your funds are no longer being traded by the master trader.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 33 of 152
27 of 106

The Final Newsletter also assured clients that, despite the transition to the new platform,

withdrawals would continue to be processed:

> ### WITHDRAWALS
> You will see a much more organized and smooth flow of
> withdrawals go out with the new platform due to their strong
> payment processing solutions in place. Please DO NOT message
> the support inbox constantly with your order number, we will
> have all this data migrated over and are fully aware of each and
> everyone one of your withdrawals. There is no sugar coating it,
> there are many withdrawals to tend to, and they will get to them
> as fast as possible, but this will not be an overnight fix. We do
> not have an exact timeframe on when all backlog will clear the
> moment [sic], please be patient while we diligently work to clean

74. These statements were also false. Despite TD's assurances that the acquisition

would lead to "faster transaction[s]" and an "organized and smooth flow of withdrawals,"

hundreds, if not thousands of customers have been unable to withdraw their funds more than a

year after the transition to Trubluefx. Despite Trubluefx representing that it was holding TD

customer accounts in full, upon information and belief, Trubluefx lacks the funds to repay

customers, because the funds were misappropriated and not traded as purported.

### e. The TD Defendants Falsified Trading Records

75. To conceal the fraud, TD and Safranko falsified trading records.

76. As discussed above, once a customer opened an account with TD (either directly

or as described below, through a sponsor), they were directed to download the Trading App. The

Trading App enabled customers to actively monitor the trading activity in their TD trading

account. In addition, TD sent daily confirmation statements via email to customers (or in some

instances, to their sponsors) showing, among other things, the trading activity, margin, and

account balance for the account.

- 23 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 34 of 152
28 of 106

77. Throughout the Relevant Period, customers observed through the Trading App and in their daily confirmation statements trading results that were nearly always positive. In order to achieve these remarkable gains, TD manipulated trade data to "disappear" purported trading losses. Although the trading activity customers observed through the Trading App was nearly always positive, on a number of occasions customers observed temporary large losses in their accounts. When those customers raised concerns with TD (either directly or through their sponsors), the TD Defendants would respond (either directly or through a sponsor) that the losses were the result of "slippage" or "system errors" and assured customers that the losses would be reversed. TD informed at least one customer that TD had a had a "standing agreement" with its "Liquidity Provider who is our counterparty" to reverse within 24 to 48 hours any losing trades caused by slippage.

78. TD's explanations for the trading loss reversals were false. For example, on October 12, 2022, one customer observed nearly a 52% loss in his account. Within a few hours TD had adjusted the account to reflect only a very small loss for the day. However, the customer observed that the trades were adjusted by TD **to prices where the market was not trading at those times on those days**. The customer documented the irregularities by taking screenshots of the Trading App and sought an explanation from TD. TD responded that the adjustments were caused by technical issues, including the alleged difference between the aggregator pricing and what the Trading App software could handle. When the customer further pressed TD to explain how trades were being adjusted hours after they were executed to prices not reflective of the market, TD again referenced technical issues but did not respond to the customer's specific questions.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 35 of 152
29 of 106

### f. The TD Defendants Misappropriated Customer Funds

79.     Rather than accept funds in the name of the TD Pool, the TD Defendants instead
directed customers to deposit funds through a variety of means including via: (1) wire transfer
into U.S. bank accounts held in the names of various third parties but controlled by TD; (2) via
various payment processors contracted by TD, who acted at the direction of TD; and (3) crypto
currency wallets, which, on information and belief, were controlled by TD.

80.     For example, during the Relevant Period, TD directly and as discussed further
below, through the Sponsor Defendants, caused no less than $180 million in customer funds to
be deposited into bank accounts held in the name of various third-party entities that TD
controlled through a TD agent who was the signatory on these accounts. None of these third-
party entities were firms that engaged in trading. None of the funds deposited in these third-
party bank accounts were ever sent to TD or any other firm that engaged in trading. Instead, TD
directed its agent to use customer funds deposited into the third-party bank accounts to make
payments unrelated to trading and to make Ponzi-style payments to other customers.

81.     Indeed, Safranko admitted that TD made Ponzi-style payments by using new
customer deposits to fund pending withdrawals for other customers. In a video conference that
occurred in or around November 2022, Safranko stated that "transfers coming in" can be used to
"exit [] people out with that deposit." Similarly, in a call with customers in or around August
2022, Safranko said that TD does a lot of "ledger transactions" and "instead of moving money
from our liquidity pool, we just do a simple accounting" by using new customer deposits to pay
withdraw requests for different customers.

82.     During the Relevant Period, TD also accepted deposits from customers via
various payment processing firms that accepted credit and debit card transactions. Beginning in

- 25 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 36 of 152
30 of 106

at least 2019, Traders Domain engaged a payment processing firm ("Payment Processing Firm") based in Utah to accept credit and debit card deposits from U.S. customers through TD's website. During the Relevant Period, Payment Processing Firm accepted at least $19 million in customers deposits for TD.

83. None of the funds accepted by Payment Processing Firm were ever sent to TD or to any other entity engaged in trading. Instead, TD directed Payment Processing Firm to use customer funds to pay expenses unrelated to trading and to make Ponzi-style payments to other customers.

84. In addition, TD also accepted deposits via cryptocurrency directly and, after October 2022, via Crypto Payment Processor, which accepted at least $16 million in customer deposits for TD. Upon information and belief, millions of dollars in customer funds were accepted through these crypto channels and never returned despite withdrawal and liquidation requests.

85. As a result of the TD Defendants' misappropriation, upon information and belief, the majority of TD customers have been unable to withdraw funds deposited with TD for the purpose of trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

### g. Trubluefx Misappropriated Customer Funds

86. Trubluefx misappropriated customer funds that were "migrated" to its platform following a purported acquisition by refusing to return those funds despite repeated withdrawal and liquidation requests.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 37 of 132 Page
31 of 106

87.     On July 19, 2023, TD customers received an email welcoming them to Trubluefx.

The welcome email provided instructions on how customers could access their "migrated"

accounts. Trubluefx also assured customers that it was "fully aware" of all "current pending

withdrawals" and promised to provide "more clarity" on an "exact timeline" for the resumption

of withdrawals in future emails. The welcome email directed customers to visit the website for

www.Trubluefx.com, which indicates in the "About Us" page that Trubluefx is operated by Ares

Global Ltd.

88.     Trubluefx continued to assure customers that withdrawals would eventually be

processed. On October 20, 2023—*more than a year* after customers began experiencing

withdrawal issues—Trubluefx continued to tell clients that withdrawals would resume and

blamed broader economic conditions for the delays:

> Withdrawals: We have made progress getting to a complete
> resolution on this matter but we still have many steps to
> complete. This is a long process due to the current economic and
> banking situation. As you can see we are truly working on this
> situation to get resolved. Trading has graciously started and our
> team is working around the clock to get additional tasks
> completed. Please give us time while we navigate. Upon full
> functionality we will notify you via email.

89.     Despite purporting to hold TD customer funds and receiving repeated withdrawal

requests, to date thousands of customers have been unable to withdraw their funds from

Trubluefx.

### h. The TD Defendants Failed to Register with the CFTC

90.     As described above, during the Relevant Period, TD was acting as an unregistered

CPO by soliciting funds from individuals, including U.S. customers, for a commodity pool for

the purpose of trading leveraged or margined XAU/USD.

- 27 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-BJC-CKD Document 1 Filed 10/15/24 Page 38 of 132
32 of 106

91.     Although TD's website claimed that TD did not "accept applications from

residents of the U.S.," among other countries, TD actively solicited and accepted funds from

U.S. customers, including through sponsors. For example, TD and sponsors directed U.S.

customers to select "CRYPTO" as their country of origin (instead of USA, which was not listed

as an option) when creating a TD account.

92.     TD used telephone, emails, wire transfers, internet and other means or

instrumentalities of interstate commerce to solicit, accept and receive customer funds for the

purposes of trading XAU/USD.

93.     TD was never registered as a CPO and was not exempt or excluded from

registration as a CPO.

94.     During the Relevant Period, Safranko and Negus-Romvari were acting as

unregistered APs of a CPO, TD, by soliciting customers to participate in the TD Pool while

associated with TD as a partner, officer, employee, or similar agent.

95.     Neither Safranko nor Negus-Romvari were ever registered as an AP of TD.

### i. Safranko and Negus-Romvari are Controlling Persons of TD

96.     Safranko and Negus-Romvari are controlling persons of TD. Safranko and

Negus-Romvari incorporated and registered TD in Saint Vincent and the Grenadines in 2017 as

co-owners. In addition, upon information and belief, Safranko opened bank accounts in the

name of TD, and both Safranko and Negus-Romvari paid invoices on behalf of TD from their

personal accounts throughout the Relevant Period.

97.     Although Safranko and Negus-Romvari later took steps to hide their role with

TD, they were still firmly in control of TD operations throughout the Relevant Period.

Beginning in or around May 2019, Safranko and Negus-Romvari took steps to conceal Negus-

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 39 of 152
33 of 106

Romvari's role with TD. Upon information and belief, Safranko and Negus-Romvari removed

Negus-Romvari as a Director and re-issued all of TD's shares to Safranko.

98.     Upon information and belief, in or around January 2020, Safranko also "resigned"

on paper as a Director and cancelled his shares. Three years later, on January 18, 2023, despite

Safranko's previous resignation, TD sent its customers an email notifying them that Safranko

was purportedly no longer the director or CEO but assured customers of his continued

involvement with the business:

> With this communication we would like to update you on
> leadership changes at The Traders Domain.    Effective,
> immediately, Ted Safranko will step down as CEO and Director
> of Traders Domain.
>
> Please be noted this is not a short term decision, [W]e have
> enrolled a new director and CEO in the name of [REDACTED]
> back in January 2020 and we have taken the time since to hand
> over the processes and responsibilities to streamline the business
> and guarantee business continuity.
>
> Ted Safranko is—and will remain to be available as a trusted
> advisor to the business and be in communication with our clients
> and community as we address and resolve the current withdrawal
> delays and customer support scale up.

99.     Even after being removed as a co-owner on paper, Negus-Romvari continued to

control the day-to-day operations of TD, including by paying invoices on behalf of TD out of his

personal accounts, travelling to meetings on behalf of TD for the purpose of recruiting sponsors,

communicating with sponsors, and paying invoices on behalf of TD.

100.    Similarly, after "resigning" as director January 2020, Safranko continued to

identify himself in email as the CEO of TD and represented himself as the owner of TD to

Sponsors and customers in various virtual and electronic meetings that took place in 2022 and

2023. Safranko also moderated the Traders Domain Official Community Chat on Telegram and

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/13/24 Page 40 of 152
34 of 106

used this forum to communicate numerous times a week with more than 3,800 TD customers on topics including the status of customer withdrawals, the purported reasons for payment delays, TD's liquidity, and the alleged acquisition of TD by another brokerage.

## B. THE ALGO DEFENDANTS' FRAUDULENT SCHEME

101.    Beginning in at least October 2021 through the present (the "Relevant Algo Period"), Algo, that is Algo Capital and Algo FX, now known as Quant5, by and through their officers, employees, and agents and Robert Collazo, Jr., Juan Herman, John Fortini, and Stephen Likos (previously defined as the "Algo Defendants") fraudulently solicited customers for the purpose of participating in pooled trading of leveraged or margined XAU/USD by Algo (the "Algo Pool") by making material misrepresentations and omissions to prospective and actual customers. In fact, Algo was using customer funds to participate in the TD Pool despite the fact that Algo knew or should have known that TD was not trading customer funds as it purported (*see* below at Part IV.B.c). In addition, the Algo Defendants misappropriated and commingled customer funds and/or failed to register as required under the Act. Pursuant to this scheme, at least 242 Algo customers deposited no less than $39 million for the purposes of participating in the Algo Pool.

### a.    Algo Begins Soliciting for the TD Pool

102.    Algo first became involved with TD in 2019 when they were shopping for a brokerage on which Algo could trade its own customer funds manually or using its own algorithm. Safranko participated in numerous teleconferences and in-person meetings in or around Miami, Florida with Collazo, Herman, and/or Fortini, including to discuss how Algo Capital could collect commissions based on the trading of customer funds at TD. Algo began using TD as a brokerage in 2019 and continued to work closely and communicate with Safranko throughout the Relevant Algo Period.

- 30 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
35 of 106
Case 2:24-mc-00405-BJC-CKD Document 1 Filed 10/15/24 Page 41 of 152 Page

103.     In or around October 2021, after suffering large trading losses, Algo advised its

customers that it was switching to a "XAU/USD strategy." Thereafter, Algo stopped engaging in

its own proprietary trading of customer funds and instead used those funds to participate in the

TD Pool, while misrepresenting and/or failing to disclose this fact to actual and prospective

customers.

### b. The Algo Defendants Fraudulently Solicited Customers

104.     During the Relevant Algo Period, the Algo Defendants fraudulently solicited

prospective customers—through in-person meetings, text messages, messaging apps, telephone

calls, emails, and websites—to deposit money for the purpose of trading leveraged or margined

XAU/USD. The Algo Defendants made numerous fraudulent misrepresentations and omissions

regarding: (i) the operation of the trading business; (ii) the location of customer funds; (iii) TD's

addition to the CFTC RED List; and (iv) the ability of customers to withdraw their funds.

105.     On information and belief, some, if not all of the Algo customers are not ECPs.

#### i.     *The Algo Defendants Made Misrepresentations and Omissions Regarding the Operation of the Trading Business*

106.     During the Relevant Algo Period, the Algo Defendants made fraudulent

misrepresentations and omissions about how customer funds were traded.

107.     Some or all of the Algo Defendants made these false and misleading statements to

prospective customers on telephone calls, in text messages, and during in-person meetings. For

example, during phone calls and in text messages, Fortini falsely told numerous prospective

customers that Algo was trading customer funds using its own proprietary trading algorithm.

Likos similarly told at least one prospective customer that Algo used its proprietary algorithm to

trade, and he claimed that the algorithm never had a losing month and usually generated monthly

returns of around twenty percent.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 42 of 152
36 of 106

108. The Algo Defendants also made false statements about the trading operation in written customer agreements. The Algo Defendants sent these written agreements to customers electronically through Algo's DocuSign account that was used by Collazo, Fortini, and Likos, and through an Algo Support email account (support@algocapitalfx.com) used by the Algo Defendants. Many of these agreements were signed by Fortini on behalf of Algo Capital or Algo FX, and upon information and belief were approved by Collazo and Herman. In communications with other Algo Defendants, Collazo stated that he received copies of every customer agreement. The Algo FX customer agreements stated that all customer communications should be directed to either Collazo or Fortini, in their capacity as "Manager."

109. For example, in one version of its customer agreement, titled "Software As A Service Agreement," Algo provided a license to use its "proprietary algorithmic trading software" in exchange for 15% to 50% of the customer's trading profits. This version also stated that the "algorithmic trading program" would occur in a "hosted environment provided and maintained by [Algo]." Another version of the customer agreement, titled "Investment Management Agreement" or "Separately Managed Account Agreement," misleadingly stated that Algo would "buy, sell, exchange, convert and otherwise invest or trade" customer funds using its "gold intra-day trading strategy" and future investments may include other "algorithmic FX strategies," in exchange for 25% to 50% of the customer's trading profits.

110. These statements were false. Beginning in at least October 2021 (*i.e.*, the beginning of the Relevant Algo Period), Algo stopped using its own proprietary algorithm to trade customer funds. The Algo Defendants' internal communications, emails, and text messages acknowledged that, from at least October 2021 forward, Algo stopped using its own trading algorithm and instead purportedly directed customer funds to the TD Pool, which was

- 32 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 43 of 152
37 of 106

supposedly being traded by Safranko. During a December 19, 2023, deposition in a creditor proceeding involving Algo Capital, a representative of Algo Capital testified that Algo stopped using its proprietary trading algorithm in October 2021, and thereafter Safranko purportedly traded funds for Algo. Moreover, Safranko acknowledged Algo's false claims when he wrote the following to Herman and Fortini on January 29, 2023: "[I] wish you guys had told them you weren[']t trading cause that is causing a lot of headache [sic][.] [E]veryone is asking why Algo cap claimed they had algos then 'ted' was trading[.] [T]hat is the big issue[.]"

111. Moreover, the Algo Defendants failed to disclose to prospective and current customers that Safranko, rather than Algo personnel or an Algo algorithm, was trading customer funds. For example, beginning in October 2021, Algo began having customers sign a "Rider" agreement that purportedly advised customers of its new trading strategy. Like the other customer agreements, the Rider was sent to customers through Algo's DocuSign account used by Collazo, Fortini, and Likos, and through the Algo Support email account used by the Algo Defendants. The Rider did not disclose that Algo was no longer using its own trading algorithm, it failed to identify TD or Safranko, and did not state that Safranko, or anyone other than Algo, would be trading customer funds.

112. Throughout the Relevant Algo Period, numerous customers were deceived by these fraudulent misrepresentations and omissions, including a customer who wrote the following message to the Algo Defendants in February 2023, after the withdrawal problems started and Algo began revealing information about TD: "For the record, please know I invested my money with Algo Capital, not Traders Domain. I was told that Algo was a trading software, but it appears that Ted from Traders Domain was facilitating all trades, not Algo's software."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 44 of 152
38 of 106

### ii. *The Algo Defendants Made Misrepresentations and Omissions Regarding the Location of Customer Funds*

113.    Not only did the Algo Defendants mislead customers about who would be doing the trading, they also made fraudulent misrepresentations and omissions about where customer money was being held.

114.    Rather than send customer money to TD to trade, as further described in Section IV.B.d below, the Algo Defendants directed customers to deposit funds into bank accounts owned and controlled by Collazo and Herman. The Algo Defendants never sent funds from these bank accounts to TD or any other brokerage or trading firm. Instead, at times, Algo sent some of the customer funds to third party bank accounts and those funds were not further transferred to any brokerage or trading firm. Other times, Algo retained the customer funds in its bank account but claims to have engaged in some ledger maneuvers that purportedly funded Algo customer accounts to some degree at TD.

115.    Nevertheless, the Algo Defendants, both in its written agreements and orally, misled customers about where their funds were being held and failed to inform customers about Algo's arrangement with TD, or that funds would be transferred to third party entities that were not trading firms. For example, during telephone conversations with prospective customers Fortini and Likos led customers to believe that their funds were being held by Algo, and they did not disclose Algo's purported arrangement with TD. As part of Algo's solicitation, the Algo Defendants sent prospective customers a "New Client Information" form that welcomed them to "the ALGO Family" and provided them the opportunity to participate in Algo's "exclusive fund."

- 34 -

116.    Indeed, numerous customers were shocked to learn that the Algo Defendants

purportedly directed their funds to TD without their knowledge or authorization, including but

not limited to those who wrote the following messages to the Algo Defendants:

- "'The Broker' is not mentioned anywhere in my 7-page contract that I signed with Algo
  Capital. It was to my utmost surprise to find out that Algo was not in possession of my
  funds."

- "My Debt is with Algo Capital, I have been dealing with Algo Capital Staff including
  [salesperson T.R.] & John Fortini CEO. I visited the offices of . . . Algo Capital, before I
  made my decision to invest after being invited by [salesperson T.R.]. My Money was
  paid to Algo Capital Group[.] . . . My money owned [sic] is not from Traders Domain, I
  have had no dealing with them what so ever."

- "I did not invest my money with TD nor did I agree to use them as a brokerage, I invested
  it with Algo. I was initially told that Algo was a trading software, which in fact it appears
  that Ted from TD was facilitating all the trades, not the software."

- "I have no idea who Traders Domain or Ted Safranko are, but I have a contract with Algo
  Capital where I deposited money to be invested, and then requested the withdrawal of
  those funds last year."

### iii.    *The Algo Defendants Failed to Disclose That TD Was Placed on the RED List*

117.    The Algo Defendants failed to disclose to actual customers and prospective

customers who were solicited after July 14, 2022, that the CFTC had explicitly cautioned U.S.

customers against doing business with TD by placing it on the CFTC's RED (Registration

Deficiency) List.

- 35 -



118. The Algo Defendants learned in July or August 2022 that TD was added to the CFTC's RED List. In early August 2022, Fortini sent Herman a text message with a link to the CFTC's webpage listing TD on the RED List as of July 14, 2022, and stated: "Ummm don't think that's good[.] Don't say anything call u in 5." On December 13, 2022, Fortini sent a message to Likos acknowledging that the Algo Defendants learned of TD's addition to the RED List in July or August of 2022: "Any broker who takes us clients is supsoed [sic] to register with cftc /nfa thags [sic] what the red list is . . . Our attorney sent us that end of July / august." In another message between Collazo, Fortini, and Likos on December 13, 2022, Likos sent a link to the CFTC's RED List from July 14, 2022, which included TD, and Fortini responded, "We def spoke about this in july."

119. Despite knowing about and understanding the significance of the CFTC's warnings about TD, the Algo Defendants did not disclose this material information to prospective and current customers. For example, during telephone calls with prospective

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 47 of 152
41 of 106

customers that occurred after they learned of TD's addition to the RED List in July 2022, Fortini and Likos solicited customers without disclosing that Algo was using an unregistered, offshore brokerage that had been flagged on CFTC's RED List, which warned customers to "exercise extreme caution" and "watch for the RED flags of fraud." The Algo Defendants did not send out a communication to their existing customers notifying them of TD's addition to the RED List. Nor did the Algo Defendants update their written solicitations, including the customer agreements, to disclose this information to prospective customers. As one customer explained in a March 16, 2023 email to the Algo Defendants: "There is also the matter of the CFTC red listing in July 2022, this was not communicated to myself and had I have known I would have chosen to mitigate my risk."

<p style="text-align:center"><strong>iv.</strong> <em><strong>The Algo Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds</strong></em></p>

120. The Algo Defendants made fraudulent misrepresentations and omissions to customers about withdrawals including: (i) misleading customers to believe that Algo had control of their funds, (ii) making false and inconsistent statements about the timing of withdrawals, (iii) providing false assurances about the security of funds and the reasons for delays, and (iv) soliciting new customers without disclosing the significant withdrawal problems. These misrepresentations and omissions allowed the scheme to proceed for months after it initially began to unravel.

121. The Algo Defendants misled customers to believe that Algo had control of their money by requiring customers to submit all withdrawal requests directly to Algo through a "Withdraw Request Form." Algo, in turn, submitted corresponding withdrawal requests to TD without copying its customers. As a result of this arrangement, Algo knew exactly how many of

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 48 of 152
42 of 106

its customers were attempting to withdraw funds and how long those customers were waiting on withdrawals.

122.     Because the Algo Defendants directed customers to deposit funds into bank accounts controlled by Collazo and Herman and never sent those funds to TD, they should have been able to repay customers who made these withdrawal requests to Algo. However, the Algo Defendants lacked the funds to repay their customers because they misappropriated customer funds for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments, as detailed in ¶¶ 143 to 157 below.

123.     Beginning in or around August 2022, TD began experiencing significant delays in its ability to pay withdrawals, including to Algo's customers. On August 30, 2022, Herman stated, in a chat with Safranko and Fortini, that Algo had customers who had been waiting 30 days for withdrawals. By September 20, 2022, the issue had become even more severe, and Algo had a backlog of more than 33 outstanding customer withdrawals some of which had been pending since August 1. In the weeks and months thereafter, the backlog continued to grow and, as Algo Defendants' internal communications stated, the situation for TD and Algo was getting "uglier and uglier every day." By January 5, 2023, Algo had outstanding customer withdrawal requests to TD of approximately $27 million.

124.     Despite knowing that Algo did not control the funds and TD was unable to repay customer withdrawals in a timely manner if at all, the Algo Defendants continued to make false promises to customers about the timing of withdraws. For example, the "Withdraw Request Form" email that Algo sent to customers during this time period falsely stated that it would "take seven to fourteen business days for the proceeds of [a] withdrawal to transmit to your account following the month end reconciliation." Fortini provided similarly false and inconsistent

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

information to another Algo customer who made a withdrawal request on October 9, 2022, telling her that the withdrawal would take five to seven business days.

125.    In addition, the Algo Defendants provided false assurances about the security of funds and the reasons for delays to customers who expressed concerns about the status of their funds, even though they knew or should have known that these statements were false. For example, on November 15, 2022, Likos falsely assured one Algo customer about her pending withdrawal: "I can't apologize enough for this but *there's no fear about the safety of your money*." (emphasis added). Meanwhile, in internal communications with other Algo Defendants Likos expressed serious concerns about the growing withdrawal backlog and went so far as to proclaim to Fortini, "we're fucked."

126.    In addition to these false assurances, the Algo Defendants used other means to lull their customers into believing that their funds were safe, and withdrawals were forthcoming. On November 9, 2022, the Algo Defendants used a new customer deposit to make a partial repayment to a different Algo customer who had an outstanding withdrawal request. Likos falsely told the customer who was repaid that the funds were an initial tranche repaid by TD and he expected more funds from TD to follow. However, Likos acknowledge his lie to Fortini by telling him that, "I can buy us some time with that story."

127.    The Algo Defendants also provided false assurances to customers by repeating inconsistent timeframes provided by TD, despite the fact that the Algo Defendants knew or should have known that this information was false. For example, on December 6, 2022, the Algo Defendants sent an email, drafted by Collazo, Fortini, and other agents of Algo, to all customers and told them that "our broker expects to complete the withdrawals for August & September, and October within the coming weeks. The broker is also confident that November requests will be

- 39 -

completed by the end of December, or, at the latest, early January." Similarly, on December 15, 2022, the Algo Defendants sent an email, from the Algo Support account used by the Algo Defendants, to a customer and stated: "we are expecting all clients['] past funds to be sent by the broker before the end of next week." On December 19, 2022, the Algo Defendants sent another email from the Algo Support account and told another customer that "August, September, and October requests should be wrapped up this month and sent to your Savvy Digital Wallet." The Algo Defendants parroted these statements from TD and Safranko despite acknowledging among themselves that there was "zero proof backing" anything Safranko said and comparing Safranko to another Ponzi-schemer who "held clients off for 2 years" with similar unsubstantiated excuses.

128.    Moreover, between August 2022 and at least January 2023, the Algo Defendants continued to solicit and/or accept funds from new customers without disclosing the significant withdrawal problems.

### c. The Algo Defendants Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented

129.    During the Relevant Algo Period, the Algo Defendants ignored and/or downplayed numerous red flags that should have alerted them to the fact that TD was engaged in fraud and was not trading customer funds as purported, including (i) evidence that TD was manipulating trade data and (ii) public warnings that TD was engaged in fraud.

#### i.    *The Algo Defendants Ignored Signs That TD Was Manipulating Trades*

130.    The Algo Defendants ignored and failed to disclose to prospective and current customers that TD manipulated trade data, including by erasing losing trades.

131.    Once customers deposited funds with Algo, the Algo Defendants provided them instructions to download the Trading App that they could use to track trading activity and performance. Throughout the Relevant Period, customers observed results on the Trading App

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

that were nearly always positive—a fact which the Algo Defendants used to encourage customers to deposit additional funds and to recruit new customers. Likos, one of Algo's top salespeople, offered the following description of this sales strategy: "We'll get him hooked like hookers on meth . . . I'll have them put a mil in by month 3[.] Watch[.]"

132.    As early as May 8, 2019, when Algo was using TD as a brokerage for its proprietary trading, Safranko told Herman that he had the ability to manipulate TD's trading data to remove losses. In a WhatsApp message discussing certain Algo trades, Safranko told Herman to "figure out what the total loss could be and if you want it erased I will get the liquidity provider to pull the deals from the accounts."

133.    The Algo Defendants knew that the ability to alter trading data suggested that the trading results were not real. On October 26, 2021, Likos, while discussing a list of questions from an Algo customer, sent the following question to Fortini: "If the liquidity provider can refund bad trades how can we ensure that the profitable trades are being passed through the provider to the market?" In response, Fortini instructed Likos not to answer the customer's "questions about if the trades are real."

134.    On numerous occasions, Algo customers while monitoring their accounts via the Trading App observed suspicious trading patterns that they brought to the attention of the Algo Defendants. In response, the Algo Defendants consistently told customers that the irregularities were caused by technical issues, and they would be corrected by the broker. For example, on the morning of October 11, 2022, Algo customers observed trading losses in their accounts. Later that day, Algo sent an email, drafted by Herman and edited by Collazo, to all customers which claimed the losses were the result of a "glitch" when the "servers did not update" and they did

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRE Document 1 Filed 10/15/24 Page 52 of 152 Page
46 of 106

not represent actual trading losses. Algo assured its customers that their accounts would be

updated, and the losses would be reversed.

135.     Notwithstanding what they told customers, the Algo Defendants acknowledged to

each other that these suspicious trading patterns were actually a sign that Safranko was

manipulating trades. For instance, on October 12, 2022, when discussing TD's trade

adjustments, Fortini and Likos exchanged the following messages:

> Fortini:  If u ever worked for bookie u know u can lose games cuz ur making the
> money off everyone. Else with ur percent/ I feel like Ted [Safranko] doing that/ But
> at some point losses can outdo his gains"

> Likos: *Because u think he covered up old losses*

> Fortini: *Yea for sure.* In past the trades he closed stayed on the trade history he
> just deleted them[.] (emphasis added)

Moreover, on October 17, 2022, the Algo Defendants observed Safranko close a trade at a price

that the market did not reach that day. Fortini and Likos, in a text exchange, expressed disbelief

about how this was possible:

> Likos: How the fuck would he take profit at 1657 if it never reached there? Or am
> I reading something wrong

> Fortini: Not sure but maybe our charts not same

> Likos: I mean.:: no where [sic] ever close lol

> Fortini: Yea 1659

136.     Similarly, on December 13, 2022, Fortini and Likos were discussing certain trades

that Safranko manipulated. Fortini stated, "He obviously can change orders." Likos responded

that Safranko "deleted [a] bunch of trades completely." Likos asked how they can explain this to

Algo's customers and Fortini responded "No idea . . . ." Fortini also said he was not going to

confront Safranko about this manipulation because "I want to get money out."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

ii. *The Algo Defendants Ignored Public Warnings That TD Was Engaged in Fraud*

137.     The Algo Defendants repeatedly ignored public information indicating that TD was engaged in fraud. For instance, on June 29, 2020, a prospective customer emailed the Algo Defendants and told them he did due diligence on TD, which was listed as one of Algo's potential brokers, before investing with Algo and found three concerning articles. The customer shared the articles with the Algo Defendants in his email. The first article, https://theforexreview.com/2018/10/31/thetradersdomain-review/, identified TD as an "offshore broker"; described it as a "scam"; gave it a rating of 1/5 stars (with 1 being the lowest) and a similar 1/5 for "Safety of funds"; and contained several customer reviews that described Safranko as "a well known scammer" who stole funds from the brokerage.[1]  The second article, https://www.forexpeacearmy.com/forex-reviews/14449/thetradersdomain-forex-brokers, contained some similarly negative customer reviews. The third article, https://scamwatcher.org/the-traders-domain-review/, upon information and belief,[2] identified numerous red flags including that TD:  was an unregulated broker, not transparent, communicated poorly, did not let customers withdraw their funds, and did not guarantee the safety of customer funds.

138.     Rather than take this information seriously or offer any meaningful substantive response that addressed these warnings, the Algo Defendants downplayed the significance of these negative reviews and instead blamed them on disgruntled customers. The Algo Defendants assured the prospective customer that they had a "personal relationship" with the "broker."

---

[1] This article indicates that it was published October 31, 2018 and updated on November 30, 2022. The customer reviews referenced in this paragraph were posted in 2019.

[2] The earliest archived version of this article is from December 9, 2022.

- 43 -

139.     In addition, as set forth above in Part IV.B.b.iii, the Algo Defendants ignored the CFTC's addition of TD to the Red List and accompanying press release which warned that "a customer should be wary of providing funds to that entity."

140.     In addition to the numerous red flags about TD that the Algo Defendants had direct knowledge of, yet chose to dismiss, other public information should have alerted to the fact that TD was engaged in fraud. In September 2022, the Trading App was removed from the Apple App Store. As explained in a September 24, 2022 Foxnewsgroup.com article that referenced a September 2022 *Forbes* article, the Trading App had a plug-in "which can be used by scammers to manipulate those market prices, and simulate account balances, profits or losses. The *Forbes* article also noted that "Everything looks and feels real, but it's all fabrication."

141.     Despite observing numerous losing trades disappear in real time and knowing about numerous internet warnings and red flags regarding TD's fraudulent activity, the Algo Defendants continued to solicit customers for the scheme.

### d. The Algo Defendants Misappropriated and Commingled Customer Funds

142.     Once prospective customers indicated their desire to participate in the Algo Pool, the Algo Defendants sent them one or more of the customer agreements described above for their electronic signature. Fortini countersigned these agreements on behalf of Algo. The Algo Defendants also provided customers with instructions to deposit funds, which directed customers to deposit funds into bank accounts controlled by Collazo and Herman.

143.     During the Relevant Algo Period, rather than accept funds in the name of the Algo Pool as is required under the Act, the Algo Defendants instead accepted funds into bank accounts held in the name of Algo Capital that were owned and controlled by Collazo and Herman (collectively, as described in ¶¶ 144 and 145, the "Algo Accounts").

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/13/24 Page 55 of 132
49 of 106

144.     The Algo Defendants accepted no less than $32 million from Algo customers into Algo Capital's TD Bank account ending in *6056 that was owned and controlled by Collazo and Herman.

145.     The Algo Defendants accepted no less than $105,000 from Algo customers into Algo Capital's Oceans Bank account ending in *7405 that was owned and controlled by Collazo and Herman.

146.     Once deposited into the TD Bank account ending in *6056, customer funds were commingled with non-pool funds.

147.     The Algo Defendants never sent any customer funds from the Algo Accounts to TD or any other brokerage or trading firm.

148.     Instead, at times, Algo sent some of the customer funds to third party bank accounts and those funds were not transferred by those third parties to any brokerage or trading firm. Other times, Algo retained the customer funds in its bank accounts but claims to have engaged in ledger maneuvers to purportedly fund Algo customer accounts at TD. Algo made these ledger maneuvers even though it knew or should have known that TD was not trading customer funds as purported, and without disclosing to customers that this was how it was purportedly funding their accounts. Despite the fact that none of the customer funds were actually sent to TD, after depositing money into the Algo Accounts, customers nonetheless observed via the Trading App that their trading accounts appeared to be funded, typically within a few hours or days.

149.     After accepting customer funds into the Algo Accounts, Algo, Collazo, and Herman misappropriated some of those funds by using them for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments.

- 45 -

150.    For example, on December 29, 2021, $40,000 was wired by an Algo customer into one of the Algo Accounts at a time when the account had a balance of approximately $236. On January 4, 2022, Fortini falsely told the customer that Algo sent her "funds over to [the] broker already." However, no funds deposited by customer were sent from the Algo Account to TD. Instead, on January 3, 2022, $15,000 of the funds deposited by the customer were used to make payments to a business controlled by Fortini.

151.    On April 5, 2022, three Algo customers wired a combined $200,100 to one of the Algo accounts at a time when the balance was approximately $42,772. On April 5, 2022, Algo made a $100,000 Ponzi-style payment to another Algo customer, at least some of which was sourced by the deposits from these three customers.

152.    On September 20, 2022, $155,000 was wired by three Algo customers into one of the Algo Accounts, at a time when the account had a balance of approximately $10,000. That same day, nearly all of these funds were used to make a $35,000 payment to a business controlled by Herman, and $130,000 in Ponzi-style payments to other customers who did not deposit these funds.

153.    On October 7, 2022, $300,000 was deposited by an Algo customer into one of the Algo Accounts, at a time when the account had a balance of approximately $100,000. That same day, at least $99,000 of the customer's deposit was used to make a payment to a business controlled by Collazo or to a business controlled by Herman, and $79,000 to make Ponzi-style payments to two other customers.

154.    Likos misappropriated funds by accepting at least $635,000 from Algo customers directly into his personal bank account at Bank of America ending *6670 between August 2022 and December 2022. None of those were ever sent to Algo, TD, or to any other brokerage or

- 46 -

trading firm. Once deposited into Likos's account, the customer funds were used for purposes other than trading.

155. In addition, Fortini misappropriated funds by accepting at least $557,000 from Algo customers directly into a bank account at JP Morgan held in the name of a consulting company owned by Fortini and ending *9976 between August 2022 and November 2022. None of those were ever sent to Algo, TD, or to any other brokerage or trading firm. Once deposited into Fortini's account, the customer funds were used for purposes other than trading.

156. Algo, Collazo, Herman, Fortini, and Likos misappropriated customer funds when they used the money for purposes other than trading, such as for their personal expenses and to make Ponzi-style payments to other customers. They also misappropriated funds, upon information and belief, by taking commissions which ranged between 15-50% of the purported trading profits, despite the fact that they knew or should have known that those profits did not really exist.

157. Upon information and belief, large numbers of Algo customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD.

### e. The Algo Defendants Failed to Register with the CFTC

158. As described above, during the Relevant Algo Period, Algo Capital was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purpose of trading XAU/USD on a leveraged or margined basis.

159. Algo Capital used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept, and receive customers' funds for the purposes of trading XAU/USD.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRD Document 1 Filed 10/15/24 Page 58 of 132 Page
52 of 106

160.     Algo Capital was never registered as a CPO and was not exempt or excluded from registration as a CPO.

161.     During the Relevant Algo Period, Collazo, Herman, Fortini, Likos were acting as unregistered APs of Algo Capital, an unregistered CPO, and Algo FX, a registered CPO, by soliciting customers to participate in the Algo Pool while associated with Algo Capital and Algo FX as a partner, officer, employee, or similar agent.

162.     Collazo, Herman, Fortini, and Likos were never registered as APs of Algo Capital or Algo FX.

### f. Collazo and Herman are Controlling Persons of Algo

163.     Collazo and Herman are controlling persons of Algo. As stated above, Collazo and Herman are co-owners of Algo Capital and Algo FX. Collazo is the President of Algo Capital and Manager of Algo FX. Herman is the Vice President of Algo Capital and Manager of Algo FX. Collazo and Herman controlled the Algo Capital bank accounts that accepted customer funds. Collazo and Herman controlled the day-to-day operations, finance, accounts, and books and records of Algo Capital and Algo FX.

### C. THE SIMS' FRAUDULENT SCHEME

164.     Beginning in at least September 2021 through present (the "Relevant Sims Period"), Michael Sims fraudulently solicited customers to deposit money for the purpose of participating in pooled trading of leveraged or margined XAU/USD by his "hedge fund" by making material misrepresentations and omissions to prospective and actual customers. In fact, Sims was using customer funds to participate in the TD Pool despite the fact that Sims knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.C.b). In addition, Sims misappropriated customer funds and failed to register as required

under the Act. Pursuant to this scheme, at least 42 Sims customers deposited no less than $22 million for the purposes of trading leveraged or margined XAU/USD.

### a. Sims Fraudulently Solicited Customers

165. After working with other sponsors to solicit customer for TD, beginning in at least September 2021, Sims began soliciting customers for his own "hedge fund," through telephone calls, text messages, messaging apps, and in-person meetings. Sims made numerous fraudulent misrepresentations and omissions about: (i) the ownership and operation of the trading business, (ii) the profit and risk associated with the purported trading, and (iii) ability and timeliness of customer withdrawal requests.

166. On information and belief, some if not all of the Sims customers are not ECPs.

#### i. *Sims Made Misrepresentations and Omissions Regarding the Ownership and Operation of the Trading Business*

167. · From the outset, Sims told prospective customers that he was soliciting funds for his hedge fund. Sims claimed his hedge fund had been in operation for more than 10 years and employed a team of experienced traders to trade leveraged or margined XAU/USD on behalf of its customers.

168. These statements were false. Sims was not soliciting funds on behalf of a hedge fund. Sims did not own any "hedge fund" let alone one that had been in operation for more than 10 years and employed a team of traders. Neither Sims, personally, nor any hedge fund or other entity owned by him traded any funds on behalf of customers. Rather, as Sims later admitted to a customer, he was a sponsor that recruited customers for the TD Pool.

169. Sims also fraudulently omitted material information from prospective and current customers. For example, Sims failed to disclose to prospective customers that their funds would be sent offshore and traded by an unregistered brokerage, either in his solicitations or in

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

customer agreements. At least some of the prospective customers who believed their fund were being traded by Sims' hedge fund were not given any disclosure documents or customer agreements at all.

170.    Sims also knew and omitted to tell customers that the National Futures Association ("NFA") had warned against doing business with TD. In April 2022, in connection with an audit of another firm acting as TD sponsor with which Sims was involved, the NFA highlighted the dangers of U.S. customer money going to an offshore, unregistered broker. The NFA specifically advised that, pursuant NFA bylaws, commodity pools "cannot be doing business with that firm." Sims did not disclose any of the NFA concerns about TD to his prospective or current customers.

171.    Finally, in addition to misrepresenting the identity and location of the trading operation, Sims also omitted to tell at least one prospective customer that he would be charging commissions, and sizeable ones at that. Only after this customer received his first account statement did he notice a sizeable withdrawal from his account. When the customer questioned Sims about the withdrawals, Sims informed him that there would be "daily and monthly commissions" which would range from 40-50%. Sims did not explain who would be receiving these commissions, nor what percentage Sims himself would take.

### ii.    *Sims Made Misrepresentations and Omissions Regarding Profit and Risk*

172.    In order to entice prospective and current customers to deposit funds for the purposes of participating in the pooled trading of leveraged or margined XAU/USD by his hedge fund, Sims also made false representations about purported trading profits. For example, Sims repeatedly told customers that his hedge fund generated monthly trading profits of 40%. Additionally, Sims claimed that the hedge fund was profitable every month and that that the pool

- 50 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

only had two "losing days" in its last six to seven years of operation. Once a customer set up his or her account, Sims would facilitate the downloading and setting up of the Trading App. Through the Trading App, customers could purportedly view and monitor the trading activity in their account, but they did not have the ability to make trades or withdraw funds. The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the hedge fund was making substantial trading profits.

173.    These statements were false. In fact, the hedge fund did not generate a monthly trading profit of 40%, because the hedge fund was not trading customer funds as claimed by Sims. Moreover, Sims knew or should have known, as discussed below in Part IV.C.b, the trading statements on the Trading App, were in fact false.

174.    Sims also made fraudulent misrepresentations to prospective customers about the risk involved with the trading. When asked about the potential of losing capital, Sims told at least one customer that there were stop-loss parameters in place to prevent that. This was false; there were no stop loss parameters in place for the purported trading to prevent loss of capital.

                    iii.    *Sims Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds*

175.    Sims also made misrepresentations to prospective and current customers about the timeframe and ability to withdraw their funds allowing the scheme to proceed for months after it initially began to unravel.

176.    Sims advised some, if not all, customers that withdrawals would take 48 hours. For example, Sims told at least one prospective customer that anytime she wanted to withdraw her funds, she could text him and her money would be in her account within 48 hours.

177.    However, Sims' customers experienced significant delays in withdrawing their funds for weeks and months. Since at least September 2022, numerous customers requested to

- 51 -

withdraw funds without success. When customers asked Sims about the status of these withdrawal requests, Sims repeatedly made excuses for delays and provided false statements about the timing of the withdrawals.

178.    For example, in early September 2022, one Sims customer submitted a request to Sims to withdraw $160,000 from the pool. Sims told the customer that the withdrawal would take approximately twenty to twenty-five business days due to certain banking issues which Sims did not further describe. However, Sims failed to satisfy even this new, extended timeline. This customer made another withdrawal request for additional funds in October 2022. When he inquired again about the status of his pending withdrawal requests (September and October 2022), Sims responded, "Everything is in Que [sic]. The transition slowed the broker withdrawals down. Everything should be caught up soon and back to normal times." When the customer followed up about the still pending withdrawal requests in November 2022, Sims' assistant told him "Your withdrawal could come any day now." To date, this customer has not received any funds from Sims, TD, or Trubluefx.

179.    Similarly, another Sims' customer submitted a request to withdraw $20,000 in November 2022. Sims provided repeated excuses for the delay that he knew or should have known were false. For example, in April 2023, five months after the request was submitted and after several rounds of excuses, Sims told the customer "everything will start to get back on track as soon as the acquisition is finished. They [i.e., TD] were bought out." Sims knew or should have known that this was false. Sims had witnessed the various conflicting excuses for the withdrawal delays advanced by TD beginning in September 2022. Later, Sims stopped responding to the customers communications seeking information about the pending withdrawal. To date, the customer has not received any funds from Sims, TD, or Trubluefx.

180.     Sims also attempted to dissuade customers from taking withdrawals from their

accounts. In February 2023, Sims told a customer who was considering making a withdraw that

she should consider sticking with her plan to let a one-year period go by in order to compound

her returns. Sims also explained that TD was backlogged in getting to the withdrawal requests at

this time. Only after the customer repeatedly stated that she was concerned about the delays she

was hearing about from other customers did Sims tell her to make a withdrawal request.

### b.   Sims Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented

#### i.   *Sims Knew or Ignored Signs that TD was Manipulating Trade Data*

181.     Sims knew or should have known that TD was not a legitimate brokerage and

engaged in fraudulent activity. On numerous occasions customers observed large losses in their

accounts via the Trading App, but implausibly the large losses were nearly always "corrected"

by days' end. When customers questioned Sims or TD about these "corrections," he downplayed

their concerns and told the customers that these were errors, or "slippage" and not real losses.

When at least one customer directly questioned Sims as to the irregularities in her account over

text, Sims did not respond.

182.     As it turns out, Sims himself had already identified the questionable trading

account irregularities and raised concerns. As early as November 2021, Sims noted the

discrepancies in conversation with other sponsors. Sims explained that he had seen large losses

in the TD high risk account, but they went away at the end of the day. In contrast, Sims could

see that the same XAU/USD trades were being done at another brokerage, and those trades did

not reflect the same "slippage" that were used to explain the TD discrepancies. In a text to

another sponsor, Sims queried: "Issue when I see big losses and they go away on high risk. I

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

understand slippage issues etc. ... **But if it's the same trades on lower risk, how does it not effect [Redacted Brokerage Name] too?"** (emphasis added).

### ii. *Sims Concealed TD Wires and Customer Nationalities*

183.    In addition to the other indications of fraudulent TD activity about which Sims knew or should have known, Sims demonstrated his knowledge that TD was engaged in potentially illegal and problematic activities by directing potential customers to disguise their funding payments. Sims, though his assistant, instructed potential and current customers to conceal the purpose of these deposits by directing that they use certain opaque language in the wire transfer memorandum. For example, Sims instructed one customer that his deposit should say "Services for [customer]" and further told this customer: **"REMEMBER: In the [wire] memo or if they ask you what it's for put 'services'[.] Nothing about investment/trading/hedge fund."**

### iii. *Sims Was Warned about doing Business with TD and Knew or Should Have Known About Public Warnings About TD*

184.    As described above in ¶ 170, Sims learned in April 2022 that the NFA had expressly warned against doing business with TD.

185.    Sims also ignored or recklessly failed to investigate numerous warnings about TD and Safranko circulating on the internet. As described above in ¶ 137, as early as 2020, several websites flagged TD as a concern and published numerous customer complaints. Moreover, as of July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List. As described above in ¶ 140, in September 2022 the Trading App was removed for the Apple App Store because, as reported by *Forbes* and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
59 of 106
Case 2:24-mc-00405-DSC-CKD Document 1 Filed 10/15/24 Page 65 of 152

186.    These myriad warnings should have alerted Sims that TD was engaged in a fraud. However, despite the availability of these public warnings, Sims' own concerns that the trading was manufactured, and knowing that NFA had explicitly prohibited U.S. customers from doing business with TD, Sims continued to solicit pool customers and directing their funds to the TD Pool.

### c.    Sims Misappropriated Customer Funds

187.    Despite the fact that Sims knew or should have known that TD was not trading customer funds as purported, Sims directed millions of dollars in customer funds to the TD Pool, and misappropriated customer funds by taking sizable commissions. Sims' commission ranged from 40-50% of the purported trading profit.

188.    Specifically, Sims directed customers to deposit funds into bank accounts held by two entities, which he did not own or control. Neither of the entities were a trading firm and upon information and belief, Sims did not have any agreements with these entities regarding the management or trading of customer funds. None of the funds deposited in the third-party bank accounts were ever sent to TD or any other brokerage or firm engaged in trading. Nevertheless, once deposited into the third-party accounts, customers observed via the Trading App that their accounts were funded leaving the customers to believe that their money was being traded.

189.    Upon information and belief, large numbers of Sims customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRD Document 1 Filed 10/15/24 Page 66 of 152
60 of 106

## D. THE BUGGS' FRAUDULENT SCHEME

190. Beginning in at least February 2021 continuing through present (the "Relevant Buggs Period"), Buggs fraudulently solicited customers to deposit money for the purpose of participating in the TD Pool by making material misrepresentations and omission to actual and prospective customers. Buggs solicited customers for the TD Pool despite the fact that Buggs knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.D.c). In addition, Buggs misappropriated customer funds and failed to register as required under the Act. Pursuant to this scheme, at least 517 Buggs customers deposited no less than $54 million for the purpose of trading leveraged or margined XAU/USD.

### a. Buggs Begins Soliciting for the TD Pool

191. Around February 2021, Buggs purchased a trading education company, and despite not being a licensed trader, began expanding the company beyond training and education. Buggs built upon his already large network of MLM businesses and industry acquaintances to begin soliciting customers for the TD Pool. Several months after the purchase of his trading company, Buggs began operating as a "sponsor" to solicit customers for the purpose of trading XAU/USD and then directed their funds to the TD Pool.

192. Using his existing MLM businesses and the associates affiliated with them, Buggs held out the opportunity to participate in his "private trading hedge fund" through his "private broker" as a reward for hitting certain sales tiers in his other MLM businesses. Once associates hit the "emerald" level they were given the opportunity to participate in the trading via Buggs' "private broker," creating an aura of exclusivity. Buggs concealed the identity of TD until associates reached the higher "diamond" level and executed a non-disclosure agreement.

193. Buggs also solicited prospective customers beyond his pre-existing MLM network through in-person events. For example, in early 2022, Buggs invited approximately

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

fifteen prospective customers to a dinner meeting in San Diego, California. Similarly, in 2022 Buggs attended a conference in Miami, Florida, during which he solicited at least two customers for the commodity pool.

194. Buggs also solicited other individuals with whom he had previous business deals or through acquaintances. In these instances, Buggs would demonstrate the remarkable trading returns that he was purportedly experiencing in his TD account by showing acquaintances his account on the Trading App or sending them screen shots of his returns. During these conversations, Buggs also told these prospective customers that he had been able to withdraw large sums of money from his TD account as a way of vouching for TD's trustworthiness.

**b. Buggs Fraudulently Solicited Customers**

195. During the Relevant Buggs Period, Buggs fraudulently solicited customers—through, telephone, messaging apps, and in-person events such as conferences and dinners—to deposit money for the purposes of trading leveraged and margined XAU/USD despite the fact that he knew or should have known that TD was not trading the funds as purported. Buggs made numerous fraudulent misrepresentations and omissions about: (i) the profit and risk associated with the purported trading, (ii) the mechanics and structure of the trading operation, and (iii) the ability of customers to withdraw their funds.

196. Upon information and belief, some if not all of Buggs' customers were not ECPs.

i. *Buggs Made Misrepresentations and Omissions Regarding Profit and Risk*

197. Using his MLM businesses and network of industry connections, Buggs touted the incredible returns that the commodity pool generated through leveraged or margined trading of XAU/USD. He told prospective customers that the commodity pool had an "incredible winning streak" and claimed that it "never had a losing month". Buggs told at least one

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

individual that he was making 30% returns or more monthly and sent screenshots of those returns displayed in the Trading App, including screenshots showing that his rate of return for the year was 4000 %. Buggs boasted to a business associate by text that **"I HAVE A MONEY PRINTING MACHINE."** In some instances, Buggs used the Trading App to show prospective customers the purported XAU/USD trading history and accounts that he controlled with "balances" of approximately \$80 million and \$650 million.

198.    Once a customer opened a TD account through Buggs, he facilitated the setup of the Trading App for each customer. Through the Trading App, customers could purportedly view and monitor the trading activity in their TD trading account, but they did not have the ability to make trades or withdraw funds. The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the pool was making substantial "trading profits." At least some customers who were solicited by Buggs, observed the purported gains and deposited even more funds into their TD trading accounts.

199.    These assertions about incredible gains were on their face, unrealistic and unattainable. Buggs knew or should have known that these purported trading returns were false.

200.    In addition to claiming unrealistic, sustained returns, Buggs simultaneously misrepresented that there was *de minimis* risk associated with the TD Pool. When soliciting some prospective customers, Buggs falsely claimed that the trading of XAU/USD was capped in risk, and stated that there was a 3-4% maximum risk per trade. Buggs separately told another prospective customer that that maximum potential loss was 1% of the account balance on any given day. Buggs knew or should have known that his assurances about risk of the purported trading at TD were not true. On more than one occasion, customers observed large trading losses that would inexplicably disappear from the account later in the day. Similarly, the customer who

- 58 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

was told that his maximum potential loss was 1%, observed losses in his account on several occasions, including an approximately thirty percent loss in his account on one notable day. At times when they observed losses, these customers reached out to Buggs to ask why they were seeing these losses, in excess of the 3-4% maximum risk they had been promised. Over text, social media, and/or Zoom, Buggs, and Safranko, would reassure customers that the discrepancies were "system updates" or "lags."

## ii. *Buggs Made Misstatements and Omissions About the Trading Operation*

201. Additionally, Buggs made false statements and fraudulent omissions to customers as to how the TD Pool operated. For example, Buggs falsely told at least one customer that the commodity pool used a "very conservative" algorithmic trading bot. Months later, when this customer questioned Buggs about some irregular trading activity in the account, Buggs revealed to the customer that trading was done by Safranko, not an algorithmic trading bot.

202. Buggs also knew and omitted to disclose to customers that Safranko had total control over the TD Pool, including the ability to reverse losing trades back to accounts. Customers initially did not know who was doing the trading and controlling the TD Pool, but eventually learned that it was "Uncle Ted" through live streams of the purported trading.

203. In 2021, at least one prospective customer told Buggs that he had conducted a background check on Safranko and was concerned about the negative information and reviews he had seen online. When assuring this prospective customer about the TD and Safranko warnings that he raised, Buggs made additional fraudulent statements. Buggs reassured this customer that he traded "right beside [Safranko]"; that Buggs was "in control of [his customers']￼ funds." These statements were false and misleading. In fact, Buggs did not trade his own customers' funds, nor was he in control over the funds purportedly sent to TD. And, despite

- 59 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRD Document 1 Filed 10/15/24 Page 70 of 152
64 of 106

knowing about the various warnings about and negative reviews of TD and Safranko, Buggs
continued to solicit new customers for the TD Pool and failed to tell current customers about
those warnings and negative reviews.

<div align="center">

iii. **Buggs Made Misrepresentations About the Ability of
Customers to Withdraw Their Funds**

</div>

204.   Buggs also made misrepresentations to prospective and current customers about
the ability of customer to withdraw funds and gave false assurances when withdrawals were
delayed. For example, while soliciting a business associate, Buggs repeatedly reassured him that
he could withdraw his funds whenever he wanted, and that Buggs, personally, had been able to
take sizeable withdrawals whenever he wanted. Buggs frequently made these types of
assurances about liquidity when touting TD. Ultimately, this customer was unable to withdraw
any of his funds from his TD account.

205.   Buggs continued to make false assurances about the ability of customers to
withdraw funds even after customers began to experience significant withdrawal difficulties and
delays in the Fall of 2022. In February 2023, when one customer contacted Buggs to inquire
about the delay in obtaining his withdrawal, Buggs falsely assured him that "withdrawals have
steadily gone out" from TD. Buggs knew or should have known that this statement was false:
Withdrawals had not steadily gone out since August 2022.

206.   In an effort to insulate himself from claims that he was complicit in a fraudulent
scheme, Buggs also claimed to a complaining customer that he also "had not withdrawn my
trading profits as they sit in TD." Buggs knew that this statement was false: While regular
customers withdrawals had been stalled for months, Buggs, and his family, had taken at least a
million dollars in purported trading profits from TD accounts during this time period.

<div align="center">

- 60 -

</div>

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRE Document 1 Filed 10/15/24 Page 71 of 152
65 of 106

207. Buggs repeated TD's explanations for the withdrawal delays that he knew or should have known were false. TD cycled through various conflicting excuses during the Fall of 2022 for its inability to process withdrawals. Buggs advised customers that it was taking TD longer to process withdrawals because of issues with TD's liquidity provider and because certain customers were making errors when submitting withdrawal requests, which was delaying all withdrawals. At various points, customers were told by Buggs and/or his agents, that the delays in withdrawals were because: the trading platform was "migrating the system", the brokerage had legal issues, the broker was selling the company, and the platform had been attacked by hackers.

### c. Buggs Knew or Should Have Known That TD Was Not Trading Customer Funds as Purported

208. Buggs knew or should have known that TD was not trading customer funds as purported. Buggs (i) ignored warnings from experienced traders that TD was manipulating trades and that Buggs and TD were both required to be registered; (ii) instructed customers in their wires and account setup to conceal the funding of trading accounts and their U.S. residency; and (iii) knew or should have known about other public warnings about TD.

#### i. *Buggs Ignored Warnings That TD was Manipulating Trades*

209. Buggs ignored explicit warnings from individuals with extensive trading experience that the trading loss erasures from the TD Pool were an indication of fraud. When a business associate of Buggs who could observe the trading in the TD Pool questioned Buggs about the disappearance of losing trades from the TD account, Buggs responded that because Safranko owned the brokerage, he could credit back the losses. The business associate advised Buggs that Safranko crediting back the trading losses was an indication that Safranko was probably "faking the trading."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/13/24 Page 72 of 152
66 of 106

210. Buggs continued to ignore warnings from other experienced traders that the TD
Pool showed fraudulent activity. At least one other former employee of Buggs, who was also an
experienced trader, informed Buggs that, based upon the crediting of the losses, Safranko likely
had control over both sides of a purported trade. This former employee told Buggs that it was
possible, based upon this structure, that in fact no trading was going on at TD.

211. Buggs also ignored warnings from both of these experienced traders that Buggs
and TD, and their employees, were not licensed or registered, as required, to offer trading in
XAU/USD. One of the former employees went so far as to show Buggs portions of the CFTC
website to demonstrate to him the registration requirements that applied to TD and Buggs.

ii. **Buggs Concealed the Purpose of TD Wires and Residency
Status of Customers**

212. Buggs knew or should have known that TD was engaged in illegal and fraudulent
conduct because, as an agent of TD, Buggs was directing potential and current customers to
disguise the purpose of their funding payments and countries of origin. Buggs, himself and
through his assistant, instructed potential and current customers to conceal the purpose of these
deposits by directing that they use certain opaque language in the wire transfer memorandum.
For example, he instructed one customer that the deposit should say "services (ONLY!)" and if
the wire "reference include[d] anything else, the wire will be returned & the related account
closed. No exceptions!" Other customers were similarly instructed that in order to participate in
the pool through Buggs, that they must wire funds with the memo line for "Services."

213. Buggs also instructed TD customers to take deceptive steps when funding their
TD account through cryptocurrency. When customers opted to fund TD accounts with
cryptocurrency, they were asked their country of residence in the TD account set-up instructions.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Buggs and/or his assistant instructed US customers that they should choose "crypto" of their country of origin, rather than the USA.

### iii. *Buggs Knew or Should Have Known About Other Public Warnings About TD*

214. Buggs was warned numerous times by experienced traders that TD was probably engaged in a fraud. Separately, Buggs also knew that TD trading was manufactured by observing numerous disappearing losing trades. If the disappearing losing trades wasn't alarming enough, Buggs also knew that Safranko had the ability to credit back the losing trades. Buggs was also warned that TD did not hold required registrations with the CFTC, and that he should be registered as well. Finally, at least one customer told Buggs that he had performed background research on Safranko and TD, which had uncovered troubling complaints about them on the internet.

215. These warnings made it incumbent on Buggs to perform some due diligence regarding TD lest he recklessly continue to invest customer money in a seeming fraud. However, despite serving in a role where he solicited customers to deposit funds for the purpose of participating in the TD Pool and holding himself out as having experience and insight into TD, Buggs did nothing to independently investigate these red flags or allegations levied against TD. If he had, even a cursory internet search would have revealed that (i) as early as 2020, several websites, flagged TD as a concern and published numerous customer complaints; (ii) that in July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List; and (iii), in September 2022 the Trading App was removed for the Apple App Store because, as reported by Forbes and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

216. Instead of heeding or investigating the numerous red flags signaling that TD was a fraud and not engaged in legitimate trading, Buggs downplayed the warnings and continued to solicit customers for the TD Pool, collecting millions of dollars in commissions on purported trading profits.

**d. Buggs Misappropriated Customer Funds**

217. Despite the fact that Buggs knew or should have known that TD was not trading customer funds as purported, Buggs misappropriated some TD customer funds by accepting TD a portion of customer funds into bank accounts he controlled and using those funds for personal use. Buggs also misappropriated TD customer funds by taking sizable commissions on purported trading profits when he knew or should have known that profits reflected in the TD Pool account were false.

218. Initially, when a customer informed Buggs that they wanted to set up their trading account, Buggs, or his assistant acting at his direction, assisted the customers with funding their accounts. Customers were given the option to fund their TD account through bank wire or cryptocurrency. In most instances, when customers chose the bank wire option, Buggs, directed customers to deposit funds into a bank account held by a third-party entity. Buggs, did not own or control this third-party entity or its bank account. The third-party entity was not a trading firm nor did Buggs have any agreement with the third-party regarding the management or trading of customer funds. None of the funds deposited into the third-party bank accounts were ever sent to TD or any other brokerage or trading firm.

219. In a small number of instances, Buggs gave several TD customers the ability to fund their accounts more quickly than the two normal funding routes through bank wire to third-party accounts or cryptocurrency. For these customers, Buggs accepted wires into bank accounts

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

he controlled, and told one of the customers that he would make a "ledger transaction" to fund his TD accounts. None of the customer funds deposited into these Buggs-controlled accounts were ever sent to TD or any other brokerage or trading firm. Instead, Buggs misappropriated some of these customer funds for purposes unrelated to trading.

220.    For example, although he started with a bank account balance of approximately $45,000, between April 11-13th, Buggs accepted four wires from TD customers each including memo lines incorporating the word "Services," totaling $370,000. Buggs did not wire or otherwise transfer these funds to any known brokerage or trading entity. Buggs also took in an additional $110,000 from another source into the account. On April 14, 2022, Buggs used all or some of the $370,000 to wire $465,000 to a third party with a memo "Balance for Lambo."

221.    In another example, at the end of April 18, 2022, Buggs had a balance of approximately $70,000 in his bank account. Buggs accepted wires, each of which with memo lines including the description "Services," from three customers totaling $545,000 into this account. Buggs failed to transfer the funds to any known brokerage or trading entity. Two days after the customers wired the funds to Buggs' account, Buggs wired $350,000 for the purchase of a condo.

222.    Upon information and belief, Buggs also misappropriated customer funds by taking commissions of 40–50% of purported profits on trading that he knew or should have known was fabricated.

223.    Upon information and belief, large numbers of Buggs customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

## E. THE CENTURION DEFENDANTS' FRAUDULENT SCHEME

224.    Beginning in at least March 2022 through the present ("Relevant Centurion Period"), Centurion, Alejandro Santiestaban a/k/a Alex Santi, Gabriel Beltran, and Archie Rice (previously defined as, the Centurion Defendants), fraudulently solicited customers to deposit money for the purpose of participating in pooled trading of leveraged or margined XAU/USD by Centurion's "hedge fund" (the "Centurion Pool") by making material misrepresentations and omissions to prospective and actual customers. In fact, Centurion was using customer funds to participate in the TD Pool despite the fact that Centurion knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.E.c). Additionally, the Centurion Defendants misappropriated and commingled customer funds and failed to register as required under the Act. Pursuant to this scheme, at least 47 Centurion customers deposited no less than $8.4 million for the purposes of participating in the Centurion Pool.

### a. Centurion Begins Soliciting for the TD Pool

225.    The Centurion Defendants first learned of the opportunity to solicit customers for the TD Pool during a March 2022 meeting in Miami (as described above at ¶ 43).

226.    Thereafter, the Centurion Defendants engaged in numerous conversations with Negus-Romvari over text messages and Zoom calls. During those conversations Negus-Romvari provided the Centurion a "PAMM manager overview' and "profit split[s]" and commissions. Negus-Romvari encouraged the Centurion Defendants to bring in customers by offering to lower the "performance fee" charged by TD from 50% of profits to 20% if Centurion brought in at least $2 million in deposits. On May 17, 2022, Negus-Romvari shared a link which purported to show trading results for "1+ year of the algo." Among other things, the results purportedly

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-BJC-CKD Document 1 Filed 10/15/24 Page 77 of 132
71 of 106

showed monthly gains of 15% for a "conservative" account, which, Negus Romvari explained, had a "40% lower risk profile." On information and belief, the Centurion Defendants deposited funds for the purpose of "copy trading' the "bot" or "Algo" Negus-Romvari had described.

227.    Ultimately, the Centurion Defendants began to act as a sponsor for TD and to solicit customers to deposit funds for the purported purpose of trading leveraged or margined XAU/USD in the Centurion Pool when, in fact, the Centurion Defendants were directing those funds to be traded in the TD Pool.

### b. The Centurion Defendants Fraudulently Solicited Customers

228.    During the Relevant Centurion Period, Centurion fraudulently solicited prospective customers—through in-person meetings, texts messages, telephone calls, emails, and various social media accounts controlled by Beltran and Santi—to deposit money for the purpose of trading leveraged or margined XAU/USD. The Centurion Defendants made numerous fraudulent misrepresentations and omissions regarding (i) who controlled customer funds; (ii) how customer funds would be traded; (iii) historical profits of their "hedge fund"; and (iv) the ability of customers to withdraw their funds.

229.    On information and belief, some, if not all of Centurion's customers, are not ECPs.

### i.    *The Centurion Defendants Made Misrepresentations and Omissions Regarding Who Controlled Pool Funds*

230.    To entice prospective customers to deposit money for the purposes of participating in the Centurion Pool, social media posts by Santi led customers to believe that the Centurion "hedge fund" was in control of the funds. For example, in or around March 2022, Santi posted a message on one of his social media accounts indicating that "Centurion Capital Hedge Fund Is Now Live" for investors with a "$100k Min Deposit."

- 67 -



In addition, Beltran falsely told at least one customer that "Centurion controlled all of the funds." Centurion did not control customers funds. Rather than holding the funds in an account controlled by Centurion as they represented they would, Centurion was using the funds to participate in the TD Pool.

### ii. *The Centurion Defendants Made Misrepresentations and Omissions Regarding How the Funds Would Be Traded*

231. The Centurion Defendants also made false and conflicting statements about the method Centurion was using to trade the funds, representing, at various times, that:

      i. Centurion used an "algorithmic trading bot" or "AI" to trade the funds;

      ii. Alex Santi manually traded the account; and/or

      iii. another unspecified "pro trader" "managed" the account.

232. Moreover, Centurion sent customers a "Forex Account Management Agreement" which similarly represents that Centurion is trading the funds using an algorithm. The Agreement represents that Centurion, as "Manager" "is a "group of retail traders in the name of

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Manager" and that the Client is entering into the Agreement because he wishes "to have Manager apply an Expert Advisor Trading Bot to the Client Funds."

233. On another occasion when a customer was having difficulty obtaining a withdrawal due to alleged issues with the broker, the customer questioned Rice: "Okay, I thought this was your company though. Is it not." Rice responses confirmed the customers false belief that Centurion was managing the trading and merely using the broker to process trades: "Managing, yes. But still need a broker to process transactions of course inside the market."

234. These statements were false. Centurion did not trade any of customer funds by applying a "Bot" or algorithm or having Santi or a "pro trader" make the trades. Despite what they told their customers, the Centurion Defendants did not do the trading on behalf of their customers.

iii. **The Centurion Defendants Made Misrepresentations and Omissions Regarding the Historical Profits of Their "Hedge Fund"**

235. The Centurion Defendants also made fraudulent misrepresentations about the trading performance of the Centurion Pool. The Centurion Defendants falsely told prospective customers that the Centurion Pool earned monthly returns ranging from 10 to 60 percent.

236. For example, in June 2022, Beltran posted an image purporting to show transactions in XAU/USD trades overlaid with the caption, "Autopilot 17k profits in 3 days." The post further stated, "If you wonder what's this it's an investment acc manage by a pro trader that produces 40-60% monthly returns[.]" [sic]. Santi advertised a "10%+ Monthly ROI DEAL" and invited potential customers to send him a direct message to obtain additional information.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER




237.    Beltran and Rice also sent prospective customers text messages touting purported profits earned on certain Centurion trading accounts. For example, on one occasion in September 2022, Beltran sent a prospective customer a screen shot of an account that he alleged was started "end of Dec last year" which purported to show more than $4.4 million in "withdrawals" and only $1 million in deposits, representing a profit of more than $3 million over a 9 month period and an annualized return on investment of more than 600%. On another occasion in December 2022, when asked by a customer, "What have been your historical returns here and how have the losses been historically." Rice responded that the monthly returns "[a]fter broker fees & commission & profit splits" was "10-12%."

238.    The Centurion Defendants also encouraged customers to use these fraudulent misrepresentations to recruit new participants by offering referral or "affiliate" fees for each new customer brought in. For example, Beltran sent a customer a video purporting to show trading profits overlaid with the text "Autopilot 17k profits in 3 days 🌊" and encouraged him to post the video on Facebook to see if he could solicit new customers.

- 70 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRC Document 1 Filed 10/15/24 Page 81 of 132
75 of 106

239. These statements were false. Centurion did not trade any customer funds much
less generate the large, purported returns being advertised.

### iv. *The Centurion Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds*

240. The Centurion Defendants made false and inconsistent statements about the
process for withdrawing customer funds and provided false assurances when withdrawals were
delayed allowing the scheme to continue for months after it began to unravel.

241. When initially soliciting customers the Centurion Defendants falsely represented
that they could withdraw funds on a monthly basis by submitting a request to Centurion.
Centurion would then submit the request to TD. However, in, or around August 4, 2022, the
Centurion Defendants were alerted by Negus-Romvari that TD was unable to process in a timely
manner all of the withdrawals Centurion had requested on behalf of its customers.

242. Negus-Romvari told the Centurion Defendants that they were requesting too
many withdrawals and that any recently submitted withdrawal requests "wont [sic] be processed
any time soon." In response, Rice asked on a WhatsApp thread that also included Santi and
Beltran:

> So Dave question bro, if we have 10M inside you're saying we
> can only withdraw up to 5% of that each month?
> I think that's kinda low considering the high returns . . . . . that
> means each client can only pull a very small % of their funds each
> month.
> **So realistically are they EVER entitled to their funds or there
> will be an issue when they want to liquidate their accts for
> whatever "emergency reasoning."** (emphasis added)

243. After being alerted to withdrawal issues by Negus-Romvari and expressing
concerns that customers may never be able to withdraw funds, the Centurion Defendants did not
share these concerns with customers and failed to disclose to customers who were solicited after

- 71 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
76 of 106
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 82 of 152 Page

August 2022 that Centurion's existing customers were experiencing significant delays on withdrawals requests.

244. Instead, they made various and conflicting excuses to their customers about the withdrawal delays. For example, in or around September or October 2022 in response to the delays, the Centurion Defendants told at least one customer that Centurion was switching to a quarterly, as opposed to a monthly, withdrawal system. Centurion informed other customers that the delays were the result of issues with Traders Domain—not Centurion—revealing to some for the first time that Traders Domain—not Centurion—had possession of the funds. In January 2023, when a customer expressed concern that the Centurion Defendants were engaged in a Ponzi scheme, Beltran falsely assured him that TD was "processing withdrawals non[] stop for regular trading acc's What we are waiting is for the pamms."

245. In or around March 7, 2023, Centurion sent a demand letter to TD detailing that, since December 2022, Centurion had made "dozens of requests for withdrawals totaling $19,143,698.82" which remained to be processed and accusing TD, Safranko, and Negus-Romvari of "misappropriate[ing]" and "deliberately withholding" those funds and operating a "Ponzi scheme." They did not disclose these concerns to customers and instead continued to provide false assurances for months after they personally came to believe the TD Defendants were engaged in a fraud.

246. For example, on March 18, 2023, Rice assured one customer who was expressing concern about his pending withdrawal that "theres [sic] no doubt in my mind" that the funds would be returned. On April 24, 2023, when a customer reached out to Beltran because she was unable to login to her TD account via the Trading App and requested to withdraw $75,000, Beltran advised her "there [sic] currently migrating the broker to a new platform We are waiting

COMPLAINT FOR INJUNCTIVE RELIEF CIVIL MONETARY PENALTIES RESTITUTION AND OTHER

for them to be finished Once they are done we will provide the new login credentials." In June 2023, when the same Centurion customer reached out for an update, Beltran forwarded her statements Safranko made on Telegram and assured her that "they should be giving access to all the accounts" and that "At [sic] soon as we get access absolutely we can submit the request."

### c. The Centurion Defendants Knew or Should Have Known that TD was Engaged in Fraud and Not Trading the Funds as Purported

247.    During the Relevant Centurion Period, the Centurion Defendants knew or should have known that TD was not trading the funds as promised and, rather, was engaged in fraud. The Centurion Defendants ignored evidence that TD was manipulating trade data. In addition, the Centurion Defendants should have known about other public warnings circulating on the internet that would have alerted them to TD's fraud.

#### i.    *The Centurion Defendants Ignored Evidence that TD was Manipulating Trade Data*

248.    After receiving a customer's initial deposit, the Centurion Defendants would provide the customer with log-in information for the Trading App. Through the Trading App, customers could purportedly view and monitor the trading activity in their Centurion trading account, but they did not have the ability to make trades or withdraw funds. The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the pool was making substantial trading profits.

249.    However, on occasion, when monitoring their accounts via the Trading App, customers observed large losses in their accounts only to have those losses later corrected.

250.    For example, in or around October 2022, several customers observed substantial trading losses that appeared to nearly wipe out the value of their accounts. When those customers raised the issue with Centurion, a Centurion "customer service representative" downplayed the customers' concerns and claimed the losses were the result of a "system error"

- 73 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 84 of 152
78 of 106

and did not represent actual trading losses. The Centurion representative assured those customers that the account would be updated, and the losses reversed. When customers asked how this was possible, the Centurion representative claimed that it had the ability to credit the account and reverse the losses, an indication that the trading was falsified. Later that day, customers observed through the Trading App that the trading losses in the account were reversed.

251. Similarly, on or around November 30, 2022, some customers observed their trading account value drop by approximately fifty percent. When asked about this, Centurion again stated that these did not represent actual trading losses and minimized customer concerns by suggesting that they were the result of a "systems error" and a "glitch that will be corrected." Again, the trading losses were reversed later in the day.

252. Centurion knew that TD had the ability to alter trade data on completed trades. TD's ability to alter trade data on completed trades, should have alerted the Centurion Defendants that TD was not actually trading customers' funds as purported and/or was altering trade data to hide trading losses.

253. This is particularly true given Santi's purported trading experience. Santi holds himself out as an "expert" trader. On various social media platforms, websites, and podcasts, Santi advertises that he has been trading forex for more than five years and has made millions of dollars doing so. In connection with one of his other businesses, Santi sells educational courses and "mentoring" to other traders. Its website prominently displays the CFTC banner, falsely suggesting that he and/or the business are registered with the CFTC. Moreover, Santi acknowledge that traders often used deception to make their results appear to be more profitable than they were in reality. For example, Santi advised a customer that "it is all marketing" and

- 74 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
79 of 106
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 85 of 132 Page

"not everything is the way it seems." Santi told the customer that he would take screen shots of his trading gains and profits, but not of his trading losses to give the appearance of profitability.

ii. *The Centurion Defendants Knew or Should Have Known About Public Warnings About TD*

254. In addition to the evidence of trade manipulation, there were numerous warnings about TD and Safranko circulating on the internet that should have alerted the Centurion Defendants to the fact that TD was engaged in fraud.

255. As described above in ¶ 137, as early as 2020, several websites, flagged TD as a concern and published numerous customer complaints. Moreover, as of July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List. Additionally, as described above in ¶ 140, in September 2022 the Trading App was removed for the Apple App Store because, as reported by *Forbes* and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.

256. Despite its knowledge of the manipulated trade data and the publicly available warnings, the Centurion Defendants continued to solicit customers for the TD Pool.

**d. The Centurion Defendants Misappropriated and Commingled Customer Funds**

257. Once prospective customers indicated their desire to participate in the Centurion Pool, Centurion would send them a Forex Account Management Agreement for their electronic signature. Thereafter, rather than accept funds in the name of the Centurion Pool as is required under the Act, the Centurion Defendants instead directed customers to, alternatively, deposit funds via: (i) wire transfer into bank accounts held in the names of other entities that Santi, Beltran, and/or Rice owned and controlled; (ii) wire transfer into bank accounts held in the name of a third party jeweler; (iii) crypto currency into wallets which, upon information and belief, were controlled by the Centurion Defendants, the TD Defendants, or their agents.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

258.     Centurion customers deposited funds into bank accounts controlled by Santi,

Beltran, and Rice for the purposes of trading leveraged or margined XAU/USD in the Centurion

Pool, including:

- Centurion customers deposited no less than $40,000 into a Wells Fargo account ending in *3012 held in the name of Centurion Capital Group, Inc. and controlled by Santi and Beltran.

- Centurion customers deposited no less than $2.7 million into a Wells Fargo account ending in *3745 held in the name of a Santi-controlled business.

- Centurion customers deposited no less than $1.95 million into a Wells Fargo account ending in *2211 held in the name of another Santi-controlled business.

- Centurion customers deposited no less than $845,000 into a J.P. Morgan Chase account ending in *7579 held in the name of a Beltran-controlled business.

- Centurion customers deposited no less than $1.6 million into a Comerica account ending in *6339 held in the name of a Rice-controlled business.

259.     Once deposited into one of the accounts described in ¶ 258 (the "Centurion

Accounts"), customer funds were commingled with non-pool funds.

260.     No funds were ever sent from the Centurion Accounts directly to TD or any other

brokerage or trading firm.

261.     Despite the lack of direct transfers, after depositing money into the Centurion

Accounts, customers nonetheless observed via the Trading App that their accounts appeared to

be funded typically within a few hours or days.

262.     The Centurion Defendants also misappropriated some of the customer funds

deposited into the Centurion Accounts by using them for purposes unrelated to trading, to pay

themselves, and to make Ponzi-style payments.

263.     For example, on August 2, 2022, $40,000 was deposited via wire transfer by a

customer into the Wells Fargo account held in the name of Centurion Capital Group, Inc. and

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

controlled by Santi and Beltran at a time when the account had a balance of $11.39. On August 15, 2022, nearly all of the $40,000 was transferred to a personal bank account of Santi leaving only $31.39 remaining in the account.

264.  On September 30, 2022, a customer deposited $1,200,000.00 via wire transfer into a Wells Fargo account held in the name of a Santi-controlled business at a time when the balance was $645.99. Within four days, Santi had spent all of $1,200,000.00 including by making $564,000 in Ponzi-style payments to other customers.

265.  On April 18, 2022, a customer sent $100,000 to the Comerica account ending in 6339 held in the name of a Rice-controlled business at a time when the balance in the account was only $8,668,50. By April 26, 2022, Rice had misappropriated at least $40,000 of that deposit, transferring $18,684 to another bank account held in the name of, another business entity owned by him, writing a check for $2,500 to a tile company for "Home Install", and sending a $14,000 wire to a design company.

266.  In addition to directing customers to deposit funds into the Centurion Accounts, the Centurion Defendants also directed some customers to wire money to accounts controlled by a third-party jeweler ("Jeweler Accounts") who Centurion purportedly used as a source for cryptocurrency. Centurion customers deposited no less than $838,000 into the Jeweler Accounts. None of the customer funds deposited into the Jeweler Accounts were sent to TD or another trading firm. Despite the lack of direct transfers, after depositing money into the Jeweler Accounts, customers nonetheless observed via the Trading App that their accounts appeared to be funded typically within a few hours or days.

267.  On information and belief, the primary method by which Centurion customers deposited funds for purported trading was via cryptocurrency. Centurion instructed customers to

- 77 -

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 88 of 152
82 of 106

deposit funds into cryptocurrency wallets, which upon information and belief were controlled by the Centurion Defendants, the TD Defendants, or their agents. After depositing money into the cryptocurrency wallets, customers observed via the Trading App that their accounts appeared to be funded typically within a few hours or days.

268.    The Centurion Defendants misappropriated customer funds when they used the money for purposes other than trading, such as for their personal expenses and to make Ponzi-style payments to other customers. The Centurion Defendants also misappropriated funds, upon information and belief, by taking commissions which ranged between 40-60% of the purported trading profits, despite the fact that they knew or should have known that those profits did not really exist.

269.    Upon information and belief, large numbers of Centurion customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

**e.    The Centurion Defendants Failed to Register with the CFTC**

270.    As described above, during the Relevant Centurion Period, Centurion was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purpose of trading XAU/USD on a leveraged or margined basis.

271.    Centurion used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept, and receive customer funds for the purposes of trading XAU/USD.

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 89 of 152
83 of 106

272.    Centurion was never registered as a CPO and was not exempt or excluded from

registration as a CPO.

273.    During the Relevant Centurion Period, Santi, Beltran, and Rice were acting as

unregistered APs of an unregistered CPO, Centurion, by soliciting customers to participate in the

Centurion Pool while associated with Centurion as a partner, officer, employee, or similar agent.

274.    Santi, Beltran, and Rice were never registered as an AP of Centurion.

### f.  Santi and Beltran are Controlling Persons of Centurion

275.    Santi and Beltran are controlling persons of Centurion.  As stated above, Santi

and Beltran are co-owners of Centurion.  Additionally, Santi and Beltran hold the offices of

President and Vice President of Centurion, respectively.  In addition, Santi and Beltran

controlled bank accounts, including in the name of Centurion, that accepted customer funds.

Santi and Beltran controlled the day-to-day operations, finance, accounts, and books and records

of Centurion and had the ability to hire and fire Centurion employees.

## V.  VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT ONE
Violations of 7 U.S.C. § 6b(a)(2)(A), (C), Section 4b(a)(2)(A), (C) of the Act
(Directly Against TD, Safranko, Negus-Romvari, Trubluefx, Algo Capital, Algo FX,
Collazo, Herman, Fortini, Likos, Sims, Buggs, Centurion, Santi, Beltran, and Rice)

Violations of 7 U.S.C. § 6b(a)(2)(B), Section 4b(a)(2)(B) of the Act.
(Directly Against TD and Safranko)

Violations of 7 U.S.C. § 6b(a)(2)(A), (C), Section 4b(a)(2)(A), (C) of the Act.
(Indirectly Against Safranko and Negus-Romvari as Control Persons of TD; TD for the
acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital
and Algo FX; Algo Capital and Algo FX for the acts of its agents; Santi and Beltran as
Control Persons of Centurion; Centurion for the acts and omissions of its agents)

**Violations of 7 U.S.C. § 6b(a)(2)(B), Section 4b(a)(2)(B) of the Act.
(Indirectly Against Safranko and Negus-Romvari as Control Persons of TD; TD for the
acts and omissions of its agents)**

**Fraud in Connection with Leveraged or Margined Retail Commodity Transactions**

276.    Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

277.    7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

(2)    for any person, in or in connection with any order to make, or the
making of, any contract of sale of any commodity for future delivery . .
. that is made, or to be made, for or on behalf of, or with, any other
person, other than on or subject to the rules of a designated contract
market—

    (A)    to cheat or defraud or attempt to cheat or defraud the other
person;

    (B)    willfully to make or cause to be made to the other person
any false report or statement or willfully to enter or cause
to be entered for the other person any false record; [or]

    (C)    willfully to deceive or attempt to deceive the other person by
any means whatsoever in regard to any order or contract or
the disposition or execution of any order or contract, or in
regard to any act of agency performed, with respect to any
order or contract for or, in the case of paragraph (2), with the
other person[.]

278.    Pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D), retail commodity

transactions, including the XAU/USD transactions described herein, are subject to 7 U.S.C. § 6b

"as if the agreement, contract, or transaction were a contract of sale of a commodity for future

delivery" provided that it is "entered into with or offered to"(i) a "person that is not an eligible

contract participant" (ii) "on a leveraged or margined basis."

279.    Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), defines an eligible

contract participant ("ECP"), in relevant part, as an individual who has amounts invested on a

discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual

COMPLAINT FOR INJUNCTIVE RELIEF. CIVIL MONETARY PENALTIES. RESTITUTION. AND OTHER

enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

## The TD Defendants and Trubluefx

280. During the Relevant Period, TD, Safranko, Negus-Romvari, and Trubluefx, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with leveraged or margined retail commodity transactions that were offered on a leveraged or margined basis, willfully or recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons, (2) made or caused to be made false reports or statements to other persons; and/or (3) deceived or attempted to deceive other persons.

> a. TD, Safranko, and Negus-Romvari did so by making material misrepresentations and omissions with scienter regarding, among other things, TD's trading operations and the ability of customers to withdraw their funds.
>
> b. TD and Safranko did so by falsifying trading records.
>
> c. TD and Trubluefx did so by knowingly or recklessly misappropriating customer funds.

281. On information and belief, some, if not all of the customers who deposited money at the direction of the TD Defendants for the purposes of trading leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

282. By reason of the foregoing, TD and Safranko violated 7 U.S.C. § 6b(a)(2)(A)–(C) and Negus-Romvari and Trubluefx violated 7 U.S.C. § 6b(a)(2)(A), (C).

283. The foregoing acts, misrepresentations, omissions, and failures of Safranko and Negus-Romvari occurred within the scope of their employment or office with TD. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), TD is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A)–(C).

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

284.     Throughout the Relevant Period, Safranko and Negus-Romvari controlled TD,

directly or indirectly, and did not act in good faith or knowingly induced TD's conduct alleged in

this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Safranko and Negus-

Romvari are liable for TD's violations of 7 U.S.C. § 6b(a)(2)(A)–(C).

### *The Algo Defendants*

285.     During the Relevant Period, Algo Capital, Algo FX, Collazo, Herman, Fortini,

and Likos, by use of the mails or by any means or instrumentality of interstate commerce,

directly or indirectly, in connection with retail commodity transactions that were offered on a

leveraged or margined basis, willfully or recklessly (1) cheated or defrauded, or attempted to

cheat or defraud other persons, and/or (2) deceived or attempted to deceive other persons.

> a.   Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos did so by
>       making material misrepresentations and omissions with scienter regarding,
>       among other things, the operation of the trading business; the location of
>       customer funds; that TD was placed on the RED List; and/or the ability of
>       customers to withdraw funds.
>
> b.   Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos, did so by
>       knowingly or recklessly misappropriating customer funds.

286.     On information and belief, some, if not all of the customers who deposited money

at the direction of the Algo Defendants for the purposes of trading leveraged or margined retail

commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

287.     By reason of the foregoing, Algo Capital, Algo FX, Collazo, Herman, Fortini, and

Likos violated 7 U.S.C. § 6b(a)(2)(A), (C).

288.     The foregoing acts, misrepresentations, omissions, and failures of Collazo,

Herman, Fortini, and Likos occurred within the scope of their employment or office with Algo

Capital and Algo FX, or while acting as an agent on their behalf. Therefore, pursuant to 7 U.S.C.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

§ 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Algo Capital and Algo FX are liable as principals for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A),(C).

289. Throughout the Relevant Algo Period, Collazo and Herman controlled Algo Capital and Algo FX, directly or indirectly, and did not act in good faith or knowingly induced Algo Capital's and Algo FX's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Collazo and Herman and are liable for Algo Capital's and Algo FX's violations of 7 U.S.C. § 6b(a)(2)(A), (C).

*Sims*

290. During the Relevant Sims Period, Sims, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail commodity transactions that were offered on a leveraged or margined basis, willfully or recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons and/or (2) deceived or attempted to deceive other persons.

> a. Sims did so by making material misrepresentations and omissions regarding, among other things, the ownership and operations of the trading business; historical profits and risk; and the ability of customers to withdraw their funds.
>
> b. Sims also did so by knowingly or recklessly misappropriating customer funds.

291. On information and belief, some, if not all of the customers who, at the direction of Sims, deposited money for the purposes of trading leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

292. By reason of the foregoing, Sims violated 7 U.S.C. § 6b(a)(2)(A), (C).

*Buggs*

293. During the Relevant Buggs Period, Buggs by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
88 of 106
Case 2:24-mc-00405-BJC-CKP Document 1 Filed 10/15/24 Page 94 of 152 Page

commodity transactions that were offered on a leveraged or margined basis, willfully or

recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons, and/or (2)

deceived or attempted to deceive other persons.

> a. Buggs did so making material misrepresentations and omissions
> regarding, among other things, the profit and risk associated with the
> purported trading; the mechanics and structure of the trading operation;
> and the ability of customers to withdraw funds.
>
> b. Buggs also did so by knowingly or recklessly misappropriating customer
> funds.

294.    On information and belief, some of the customers who, at the direction of Buggs,

deposited money for the purpose of trading leveraged or margined retail commodity transactions

(as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

295.    By reason of the foregoing, Buggs violated 7 U.S.C. § 6b(a)(2)(A), (C).

### *The Centurion Defendants*

296.    During the Relevant Centurion Period, Centurion, Santi, Beltran and Rice, by use

of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in

connection with retail commodity transactions that were offered on a leveraged or margined

basis (1) cheated or defrauded, or attempted to cheat or defraud other persons, and/or (2)

deceived or attempted to deceive other persons.

> a. Centurion, Santi, Beltran, and Rice did so by making material
> misrepresentations and omissions with scienter regarding, among other
> things, who controlled customer funds; how customer funds would be
> traded; historical profits of their "hedge fund"; and/or the ability of
> customers to withdraw funds.
>
> b. Centurion, Santi, Beltran, and Rice also did so by knowingly or
> recklessly misappropriating customer funds.

297.    On information and belief, some, if not all of the customers who, at the direction

of the Centurion Defendants, deposited money for the purposes of purposes of trading leveraged

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 95 of 152
89 of 106

or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

298. By reason of the foregoing, Centurion, Santi, Beltran, and Rice violated 7 U.S.C. § 6b(a)(2)(A), (C).

299. The foregoing acts, misrepresentations, omissions, and failures of Santi, Beltran, and Rice occurred within the scope of their employment or office with Centurion, or while acting as an agent on its behalf. Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1 .2 (2023), Centurion, is liable as principal for their acts, omissions, or failures in violation of 7 U.S.C. § 6b(a)(2)(A), (C).

300. Throughout the Relevant Centurion Period, Santi and Beltran controlled Centurion, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Centurion's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Santi and Beltran and are liable for Centurion's violations of 7 U.S.C. § 6b(a)(2)(A), (C).

***

301. For each Defendant named in this charge, each misappropriation, misrepresentation and omission of material fact, and false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)–(C).

### COUNT TWO
Violations of 7 U.S.C. § 6*o*(1)(A)–(B), Section 4*o*(1)(A)–(B) of the Act

(Directly Against TD, Safranko, Negus-Romvari, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Centurion, Santi, Beltran, and Rice)

(Indirectly Against Safranko and Negus-Romvari as a Control Person of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital

- 85 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 96 of 152
90 of 106

and Algo FX; Algo Capital and Algo FX for the acts and omissions of its agents; Santi and
Beltran as Control Persons of Centurion; Centurion or the acts and omissions of its agents)

## Fraud and Deceit by CPOs and APs of CPOs

302.    Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

303.    7 U.S.C. § 6o(1) prohibits CPOs and APs of CPOs, whether registered with the

CFTC or not, by use of the mails or any means or instrumentality of interstate commerce,

directly or indirectly, from "(A) . . . employ[ing] any device, scheme, or artifice to defraud any

client or participant or prospective client or participant; or (B) . . . engag[ing] in any transaction,

practice, or course of business which operates as a fraud or deceit upon any client or participant

or prospective client or participant."

304.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a CPO, in

relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool,
> investment trust, syndicate, or similar form of enterprise, and who, in
> connection therewith, solicits, accepts, or receives from others, funds,
> securities, or property, either directly or through capital contributions,
> the sale of stock or other forms of securities, or otherwise, for the
> purpose of trading in commodity interests, including any—
> . . .
>
>          (II) agreement, contract, or transaction described in  . . .
>          [S]ection 2(c)(2)(D)(i) [of the Act].

305.    Regulation 1.3, 17 C.F.R. § 1.3 (2023), defines an AP of a CPO as any natural

person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any
> natural person occupying a similar status or performing similar
> functions), in any capacity which involves (i) the solicitation of funds,
> securities, or property for a participation in a commodity pool or (ii) the
> supervision of any person or persons so engaged[.]

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

## The TD Defendants

306.     During the Relevant Period, TD solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, TD was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

307.     During the Relevant Period, TD, while acting as an unregistered CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds; making material misrepresentations and omissions with scienter; and issuing false account statements to TD customers.

308.     During the Relevant Period, Safranko and Negus-Romvari were associated with TD as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged. Therefore, Safranko and Negus-Romvari were acting as APs of a CPO.

309.     During the Relevant Period, Safranko while acting as an unregistered AP of a CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by making material misrepresentations and omissions with scienter; and by issuing false account statements to TD customers. Negus-Romvari, while acting as an unregistered AP of a CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by making material misrepresentations and omissions with scienter.

310.     The foregoing acts, misrepresentations, omissions, and failures of Safranko and Negus-Romvari occurred within the scope of their employment or office with TD. Therefore,

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CRD Document 1 Filed 10/13/24 Page 98 of 132
92 of 106

pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), TD is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and (B).

311.      Throughout the Relevant Period, Safranko and Negus-Romvari controlled TD, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, TD's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Safranko and Negus-Romvari are liable for TD's violations of 7 U.S.C. § 6o(1)(A) and (B).

*The Algo Defendants*

312.      During the Relevant Algo Period, Algo Capital and Algo FX solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Algo Capital and Algo FX were acting as CPOs, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

313.      During the Relevant Algo Period, Algo Capital, while acting as an unregistered CPO, and Algo FX, while registered as a CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds and making material misrepresentations and omissions with scienter.

314.      During the Relevant Algo Period, Collazo, Herman, Fortini, and Likos were associated with Algo Capital and Algo FX as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged. Therefore, Collazo, Herman, Fortini, and Likos were APs of two CPOs.

- 88 -

315.  During the Relevant Algo Period, while acting as unregistered APs of two CPOs,

Collazo, Herman, Fortini, and Likos committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B)

by, among other things, misappropriating customer funds and making material

misrepresentations and omissions with scienter.

316.  The foregoing acts, misrepresentations, omissions, and failures of Collazo,

Herman, Fortini, and Likos occurred within the scope of their employment or office with Algo

Capital and Algo FX or while acting as an agent on their behalf.   Therefore, pursuant to 7 U.S.C.

§ 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Algo Capital and Algo FX are liable as principals for

their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and

(B).

317.  Throughout the Relevant Algo Period, Collazo and Herman controlled, directly or

indirectly, Algo Capital and Algo FX and did not act in good faith or knowingly induced,

directly or indirectly, Algo Capital's and Algo FX's conduct alleged in this Count.   Therefore,

under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Collazo and Herman and are liable for Algo

Capital's and Algo FX's violations of 7 U.S.C. § 6o(1)(A) and (B).

***The Centurion Defendants***

318.  During the Relevant Centurion Period, Centurion solicited funds, securities, or

property for a pooled investment vehicle for the purpose of trading in leveraged or margined

retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Centurion was

acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

319.  During the Relevant Centurion Period, Centurion, while acting as an unregistered

CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things,

misappropriating customer funds and making material misrepresentations and omissions with

scienter.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 100 of 152
94 of 106

320.     During the Relevant Centurion Period, Santi, Beltran, and Rice were associated with Centurion as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged. Therefore, Santi, Beltran, and Rice were acting as APs of a CPO as defined by 17 C.F.R. § 1.3 (2023).

321.     During the Relevant Centurion Period, Santi, Beltran, and Rice, while acting as unregistered APs of a CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds and making material misrepresentations and omissions with scienter.

322.     The foregoing acts, misrepresentations, omissions, and failures of Santi, Beltran, and Rice occurred within the scope of their employment or office with Centurion or while acting as an agent on their behalf. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Centurion is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and (B).

323.     Throughout the Relevant Centurion Period, Santi and Beltran, controlled, directly or indirectly, Centurion and did not act in good faith or knowingly induced, directly or indirectly, Centurion's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Santi and Beltran and are liable for Centurion's violations of 7 U.S.C. § 6o(1)(A) and (B).

***

324.     For each Defendant named in this charge, each misappropriation, misrepresentation and omission of material fact, and false statement, including but not limited to

- 90 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 101 of 152
95 of 106

those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C.

§ 6*o*(1)(A) and (B).

## COUNT THREE
### Violations of 7 U.S.C. § 6k(2), Section 4k(2) of the Act
**(Directly Against TD, Safranko, Negus-Romvari, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Centurion, Santi, Beltran, and Rice)**

### Violations of 7 U.S.C. § 6m(1), Section 4m(1) of the Act
**(Directly Against TD, Algo Capital, and Centurion)**

### Violations of 7 U.S.C. §§ 6k(2) and 6m(1), Sections 4k(2) and 4m(1) of the Act
**(Indirectly Against Safranko and Negus-Romvari As Control Persons of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital and Algo FX; Algo Capital and Algo FX for the acts and omissions of its agents; Santi and Beltran as Control Persons of Centurion; Centurion for the acts and omissions of its agents)**

### Failure to Register as a CPO or as an AP of a CPO

325.     Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

326.     7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
> . . .
> (II) agreement, contract, or transaction described in . . . [S]ection 2(c)(2)(D)(i) [of the Act].

327.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it

shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the

mails or any means or instrumentality of interstate commerce in connection with his business as

such . . . [CPO] . . . ."

328.     Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2)(i) makes it

unlawful for any person to be associated with a CPO as a "partner, officer, employee, consultant

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00465-DJC-CKD Document 1 Filed 10/15/24 Page 102 of 152
96 of 106

or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the [CFTC]" as an AP of the CPO.

329.     7 U.S.C. § 6k(2) also prohibits a CPO from permitting "such a person to become or remain associated with" it, in any such capacity, if the CPO knew or should have known that such person was not registered as an AP.

### *The TD Defendants*

330.     During the Relevant Period, TD, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, TD was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

331.     TD is not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).

332.     During the Relevant Period, Safranko and Negus-Romvari each associated with TD as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, Safranko and Negus-Romvari acted as APs of a CPO as defined by 7 U.S.C. § 6k(2)(i).

333.     Safranko and Negus-Romvari are not registered with the CFTC as an AP of TD; thus, Safranko and Negus-Romvari acted as unregistered APs of a CPO in violation of 7 U.S.C. § 6k(2)(i).

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00465-DJC-CKD Document 1 Filed 10/15/24 Page 103 of 152
97 of 106

334.     TD supervised Safranko and Negus-Romvari and permitted them to solicit customers for the commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

335.     The foregoing acts, omissions, and failures occurred within the scope of Safranko's and Negus-Romvari's employment or office with TD. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), TD is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6k(2).

336.     Throughout the Relevant Period, Safranko and Negus-Romvari controlled, directly or indirectly, TD, and did not act in good faith or knowingly induced, directly or indirectly, TD's conduct alleged in this Count. Therefore, Safranko and Negus-Romvari are also liable for TD's violations of 7 U.S.C. §§ 6k(2) and 6m(1) pursuant to 7 U.S.C. § 13c(b).

*The Algo Defendants*

337.     During the Relevant Algo Period, Algo Capital and Algo FX, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Algo Capital and Algo FX were acting as CPOs, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

338.     Algo Capital, unlike Algo FX, was not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).

339.     During the Relevant Algo Period, Collazo, Herman, Fortini, and Likos associated with Algo Capital and Algo FX as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool or

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

supervision of someone so engaged; therefore, Collazo, Herman, Fortini, and Likos acted as APs of Algo Capital and Algo FX, as defined by 7 U.S.C. § 6k(2)(i).

340.    Collazo, Herman, Fortini, and Likos were not registered with the CFTC as APs of Algo Capital and Algo FX; thus, Collazo, Herman, Fortini, and Likos acted as unregistered APs of two CPOs in violation of 7 U.S.C. § 6k(2)(i).

341.    Algo Capital and Algo FX supervised Collazo, Herman, Fortini, and Likos and permitted them to solicit customers for a commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

342.    The foregoing acts, omissions, and failures occurred within the scope of Collazo's, Herman's, Fortini's, and Likos's employment or office with Algo Capital and Algo FX, or while acting as an agent on their behalf.    Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Algo Capital and Algo FX are liable as principals for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6k(2).

343.    Throughout the Relevant Algo Period, Herman and Collazo controlled, directly or indirectly, Algo Capital and Algo FX, and did not act in good faith or knowingly induced, directly or indirectly, Algo Capital's and Algo FX's conduct alleged in this Count. Therefore, pursuant to 7 U.S.C. 13c(b), Collazo and Herman are liable for Algo Capital's and Algo FX's violations of 7 U.S.C. § 6k(2) and Algo Capital's violation of 7 U.S.C. § 6m(1).

**The Centurion Defendants**

344.    During the Relevant Centurion Period, Centurion, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Centurion was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

345.     Centurion is not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).

346.     During the Relevant Centurion Period, Santi, Beltran, and Rice each associated with Centurion as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, Santi, Beltran, and Rice each acted as APs of a CPO as defined by 7 U.S.C. § 6k(2)(i).

347.     Santi, Beltran, and Rice were not registered with the CFTC as APs of Centurion; thus, Santi, Beltran, and Rice acted as unregistered APs of a CPO in violation of 7 U.S.C. § 6k(2)(i).

348.     Centurion supervised Santi, Beltran, and Rice and permitted them to solicit customers for the commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

349.     The foregoing acts, omissions, and failures occurred within the scope of Santi's, Beltran's, and Rice's employment or office with Centurion or while acting as an agent on their behalf. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Centurion is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6k(2).

350.     Throughout the Relevant Centurion Period, Santi and Beltran controlled, directly or indirectly, Centurion and did not act in good faith or knowingly induced, directly or indirectly,

- 95 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

["


Centurion's conduct alleged in this Count. Therefore, Collazo and Herman are also liable for Centurion's violations of 7 U.S.C. §§ 6k(2) and 6m(1) pursuant to 7 U.S.C. 13c(b).

\*\*\*

351.     Each instance that TD, Algo Capital, and Centurion, acted as a CPO but failed to register with the CFTC as such are alleged as a separate and distinct violation.

352.     Each instance that TD, Algo Capital, Algo FX, and Centurion supervised and permitted an unregistered AP to solicit customers for a commodity pool is alleged as a separate and distinct violation.

353.     Each instance that Safranko, Negus-Romvari, Collazo, Herman, Fortini, Likos, Santi, Beltran, and Rice acted as an AP of a CPO but failed to register with the CFTC as such is alleged as a separate and distinct violation.

## COUNT FOUR
**Violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023), Regulation 4.20(a)(1), (b)–(c). (Directly Against Algo Capital, Algo FX, and Centurion)**

**(Indirectly Against Herman and Collazo as Control Persons of Algo Capital and Algo FX; and Santi and Beltran as Control Persons of Centurion)**

**Failure to Operate Pool as Separate Entity; Failure to Receive Pool Participant Funds in Pool's Name; Commingling of Pool Funds**

354.     Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

355.     Regulation 5.4, 17 C.F.R. § 5.4 (2023), states that 17 C.F.R. Pt. 4 applies to any person required to register as a CPO pursuant to 17 C.F.R. pt. 5 (2023).

356.     17 C.F.R. § 4.20(a)(1) (2023) requires a CPO, whether registered or not, to operate its commodity pool as a legal entity separate from that of the CPO.

357.     17 C.F.R. § 4.20(b) (2023) prohibits a CPO, whether registered or not, from receiving pool funds in any name other than that of the pool.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA 1SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
101 of 106
Case 1:24-cv-23745-RKA-SEALED*-BJC-CKD Document 1 Entered on FLSD Docket 09/30/2024 Page 107 of 152

358.    17 C.F.R. § 4.20(c) (2023) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

*The Algo Defendants*

359.    During the Relevant Algo Period, Algo Capital, while unregistered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Algo Capital; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

360.    During the Relevant Algo Period, Algo FX, while registered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Algo FX; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

361.    Throughout the Relevant Algo Period, Herman and Collazo controlled, directly or indirectly, Algo Capital and Algo FX, and did not act in good faith or knowingly induced, directly or indirectly, Algo Capital's and Algo FX's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Herman and Collazo are liable for Algo Capital's and Algo FX's violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

*The Centurion Defendants*

362.    During the Relevant Centurion Period, Centurion, while unregistered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Centurion; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

363.    Throughout the Relevant Centurion Period, Santi and Beltran controlled, directly or indirectly, Centurion, and did not act in good faith or knowingly induced, directly or

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

indirectly, Centurion's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Santi and Beltran are liable for Centurion's violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

<center>***</center>

364.     For each Defendant named in this charge, each act of failing to operate a pool as a legal entity separate from that of the CPO, improperly receiving customer funds, and commingling the property of the pool with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

## VI.     RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.     Find that,

    1)   with respect to the TD Defendants and Trubluefx,

        a.   TD, Safranko, Negus-Romvari, and Trubluefx violated Sections 4b(a)(2)(A),(C), 4o(1)(A)–(B), and 4k(2) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

        b.   TD and Safranko violated 7 U.S.C. § 6b(a)(2)(B);

        c.   TD violated Sections 4m(1) of the Act, 7 U.S.C. § 6m(1);

    2)   with respect to the Algo Defendants,

        a.   Algo Capital, Algo FX, Collazo, Herman Fortini and Likos violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

        b.   Algo Capital violated 7 U.S.C. § 6m(1); and

        c.   Algo Capital and Algo FX violated Regulation 4.20(a)(1), (b)–(c), 17

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

C.F.R. § 4.20(a)(1), (b)–(c) (2023);

3) Sims violated 7 U.S.C. §§ 6b(a)(2)(A),(C);

4) Buggs violated 7 U.S.C. §§ 6b(a)(2)(A),(C);

5) with respect to the Centurion Defendants:

    a. Centurion, Santi, Beltran, and Rice violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. Centurion violated 7 U.S.C. § 6m(1); and

    c. Centurion violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023);

B.    Enter an order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants, and any other person or entity associated with them, from engaging in the conduct described above, in violation of the following Sections of the Act and Regulations:

1) with respect to the TD Defendants and Trubluefx, prohibiting

    a. TD, Safranko, Negus-Romvari, and Trubluefx from violating Sections 4b(a)(2)(A),(C), 4o(1)(A)–(B), and 4k(2) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. TD and Safranko from violating 7 U.S.C. § 6b(a)(2)(B); and

    c. TD from violating Sections 4m(1) of the Act, 7 U.S.C. § 6m(1);

2) with respect to the Algo Defendants, prohibiting

    a. Algo Capital, Algo FX, Collazo, Herman Fortini and Likos from violating 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. Algo Capital from violating 7 U.S.C. § 6m(1); and

    c. Algo Capital and Algo FX from violating Regulation 4.20(a)(1), (b)–(c), 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023);

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

3) Prohibiting Sims from violating 7 U.S.C. §§ 6b(a)(2)(A),(C);

4) Prohibiting Buggs from violating 7 U.S.C. §§ 6b(a)(2)(A),(C);

5) with respect to the Centurion Defendants, prohibiting:

    a. Centurion, Santi, Beltran, and Rice violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. Centurion violated 7 U.S.C. § 6m(1); and

    c. Centurion violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023);

A.      Enter an order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants, and their affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) having any commodity interests traded on any Defendant's behalf;

4) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) applying for registration or claiming exemption from registration with the CFTC

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER

Case 1:24-cv-23745-RKA *SEALED* Document 1 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 111 of 152
105 of 106

in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and

7) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

B.       Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

C.       Enter an order requiring Defendants as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

D.       Enter an order directing Defendants as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the customers whose funds were received by Defendants as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

E.       Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION AND OTHER

Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat. 584, 599–600, *see*

17 C.F.R. § 143.8 (2023), for each violation of the Act and Regulations, as described herein;

      F.     Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920, 2413(a)(2); and

      G.     Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


Dated: September 30, 2024          Respectfully submitted,

                              COMMODITY FUTURES
                              TRADING COMMISSION

                              ALISON B. WILSON (D.C. Bar 475992)
                              *(Attorney-In-Charge)*
                              KELLY M. FOLKS (VA Bar 72124)
                              SEAN HENNESSY (D.C. Bar 1011564)
                              SARAH WASTLER (D.C. Bar 944534)
                              Attorneys for Plaintiff
                              COMMODITY FUTURES
                              TRADING COMMISSION
                              1155 21st Street, N.W.
                              Washington, D.C. 20581
                              Telephone: (202) 418-5000
                              awilson@cftc.gov
                              kfolks@cftc.gov
                              shennessy@cftc.gov
                              swastler@cftc.gov

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

JS 44 (Rev. 04/21) FLSD Revised 12/02/2022    **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Commodity Futures Trading Commission | Traders Domain FX Ltd., et al. |

FILED BY _____ D.C.

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

SEP 30 2024

County of Residence of First Listed Defendant Not a U.S. entity
*(IN U.S. PLAINTIFF CASES ONLY)*
IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

NOTE:

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Alison B. Wilson, 1155 21st St, N.W., Washington, D.C. 20581
(202) 418-5000

Attorneys *(If Known)*

SEALED

**(d)** Check County Where Action Arose: ■ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

■ 1 U.S. Government Plaintiff
☐ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Med. Malpractice

PERSONAL INJURY
☐ 365 Personal Injury - Product Liability
☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**PRISONER PETITIONS**
☐ 440 Habeas Corpus:
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
Other:
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit (15 USC 1681 or 1692)
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Sat TV
■ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

■ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (See VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

**VI. RELATED/ RE-FILED CASE(S)**
*(See instructions)*: a) Re-filed Case ☐YES ☐NO    b) Related Cases ■YES ☐NO
JUDGE: Hon. Lee H. Rosenthal    DOCKET NUMBER: 4:23-cv-00336

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*:
7 USC Sections 6b, 6k, 6m and 6o -- commodities fraud using means of interstate commerce and failure to register
LENGTH OF TRIAL via 20 days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE 9/30/24
SIGNATURE OF ATTORNEY OF RECORD

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* David Negus-Romvari
Paseo de las Mariposas #100
Paraiso 800, El Tigre Club,
63732 Nuevo Vallarta, Nayarit, Mexico

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DSC-CKD Document 1 Filed 10/15/24 Page 115 of 152
2 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

### Southern District of Florida

<table>
<tr><td>Commodity Futures Trading Commission<br><br><br>——————————————————<br><i>Plaintiff(s)</i><br>v.<br><br>Traders Domain FX Ltd., et al.<br><br><br>——————————————————<br><i>Defendant(s)</i></td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Civil Action No.</td></tr>
</table>

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Ares Global Ltd.
    1st Floor, The Sotheby Building
    Rodney Bay, Gros-Islet
    St. Lucia

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
    Commodity Futures Trading Commission
    1155 21st Street, N.W.
    Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission <br><br> _____ <br> _Plaintiff(s)_ <br> v. <br><br> Traders Domain FX Ltd., et al. <br><br> _____ <br> _Defendant(s)_ | ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action No. <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Algo FX Capital Advisor LLC
c/o Jerrob Duffy
Squire Patton Boggs
2550 M Street NW
Washington, DC 20037

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____        _____
                                                          _Signature of Clerk or Deputy Clerk_

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-BJR-CKD Document 1 Filed 10/15/24 Page 4 of 16
4 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | | |
|---|---|---|
| Commodity Futures Trading Commission | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Plaintiff(s)_ | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| Traders Domain FX Ltd., et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Archie Rice
c/o Chris Davis
Gray Reed
1601 Elm Street, Suite 4600
Dallas, TX 75201

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 118 of 152
5 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | )<br>)<br>)<br>) |
| _____<br>*Plaintiff(s)* | )<br>) |
| v. | ) Civil Action No. |
| Traders Domain FX Ltd., et al. | )<br>)<br>) |
| _____<br>*Defendant(s)* | )<br>)<br>) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Gabriel Beltran
c/o Robert Long
Greenberg Traurig
2200 Ross Ave, Suite 5200
Dallas, TX 75021

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____     _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

### SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Centurion Capital Group, Inc.
c/o Robert Long
Greenberg Traurig
2200 Ross Ave, Suite 5200
Dallas, TX 75021

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____     _____
_Signature of Clerk or Deputy Clerk_

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 120 of 152
7 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No.

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Holton Buggs, Jr.
c/o David Gerger
Gerger Hennessy Martin & Peterson
700 Louisiana St, Suite 2300
Houston, TX 77002

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| Plaintiff(s) | ) |
| v. | ) Civil Action No. |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| | ) |
| Defendant(s) | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Michael Sims
c/o Drew Findling
The Findling Law Firm, P.C.
3575 Piedmont Rd NE
Suite 1010
Atlanta, GA 30305

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission<br><br>_____<br>*Plaintiff(s)*<br>v.<br>Traders Domain FX Ltd., et al.<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Steven Likos
c/o Joseph M. Schuster
Sweetnam Schuster & Schwartz
200 Vesey Street
Brookfield Place
24th Floor
New York, NY 10281

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

<table>
<tr><td>Commodity Futures Trading Commission</td><td>)<br>)<br>)<br>)</td><td></td></tr>
<tr><td><hr><i>Plaintiff(s)</i></td><td>)<br>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td>Traders Domain FX Ltd., et al.</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td><hr><i>Defendant(s)</i></td><td>)<br>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  John Fortini
                              c/o Walter Norkin
                              Akrivis Law Group, PLLC
                              One Southeast Third Avenue
                              Suite 2120
                              Miami, FL 33131

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Alison B. Wilson
                                            Commodity Futures Trading Commission
                                            1155 21st Street, N.W.
                                            Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

                                                *Signature of Clerk or Deputy Clerk*

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 124 of 152
11 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

Commodity Futures Trading Commission                      )
                                                           )
                                                           )
                                                           )
_____                            )
            *Plaintiff(s)*                                 )
                  v.                                       )      Civil Action No.
                                                           )
     Traders Domain FX Ltd., et al.                       )
                                                           )
                                                           )
                                                           )
_____                            )
           *Defendant(s)*                                 )

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Juan Herman
                        c/o Jerrob Duffy
                        Squire Patton Boggs
                        2550 M Street NW
                        Washington, DC 20037

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Alison B. Wilson
                        Commodity Futures Trading Commission
                        1155 21st Street, N.W.
                        Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Robert Collazo
c/o Jerrob Duffy
Squire Patton Boggs
2550 M Street NW
Washington, DC 20037

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____      _____

*Signature of Clerk or Deputy Clerk*

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 126 of 152
13 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| | ) |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Algo Capital LLC
c/o Jerrob Duffy
Squire Patton Boggs
2550 M Street NW
Washington, DC 20037

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 127 of 152
14 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| | ) |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Fredirick Safranko a/k/a Ted Safranko
8800 Hazelbridge Way
Richmond, BC V6X 1P6
Canada

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Case 1:24-cv-23745-RKA *SEALED* Document 1-2 Entered on FLSD Docket 09/30/2024 Page
Case 2:24-mc-00405-DJC-CKD Document 1 Filed 10/15/24 Page 128 of 152
15 of 16

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) Civil Action No. |
| | ) |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_ Traders Domain FX Ltd.
c/o WILFRED SERVICES LTD.
Suite 305, Griffith Corporate Centre
Beachmont, Kingstown
St. Vincent and the Grenadines

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_CLERK OF COURT_

Date: _____

_____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

### Southern District of Florida

| | |
|---|---|
| Commodity Futures Trading Commission | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| **v.** | ) Civil Action No. |
| Traders Domain FX Ltd., et al. | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Alejandro Santiestaban
c/o Vivian R. Drohan
Drohan Lee LLP
5 Penn Plaza, 19th Floor
New York, NY 10001

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Alison B. Wilson
Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____

                                                           *Signature of Clerk or Deputy Clerk*

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 24-cv-23745-ALTMAN

**COMMODITY FUTURES
TRADING COMMISSION,**

 *Plaintiff,*

*v.*

**TRADERS DOMAIN FX LTD.** *d/b/a*
**THE TRADERS DOMAIN,** *et al.,*

 *Defendants.*

_____/

### SEALED ORDER GRANTING PLAINTIFF'S EXPEDITED MOTION FOR AN *EX PARTE* STATUTORY RESTRAINING ORDER, APPOINTMENT OF A TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF

 The Plaintiff, the Commodity Futures Trading Commission ("Commission") has filed a

Complaint for Injunctive Relief, Civil Monetary Penalties, Restitution, and Other Equitable Relief

[ECF No. 1] and moved, pursuant to 7 U.S.C. § 13a-1(a) of the Commodity Exchange Act ("Act"),

for an *ex parte* Statutory Restraining Order freezing assets, allowing inspection of records, appointing

a Temporary Receiver, and granting expedited discovery, [ECF No. 5]. We have considered the

pleadings, declarations, exhibits, and memorandum filed in support of the Commission's motion, and

find as follows:

1. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question

  jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions

  commenced by the United States or by any agency expressly authorized to sue by Act of

  Congress). 7 U.S.C. § 13a-1(a) authorizes the Commission to seek injunctive relief against any

  person whenever it shall appear that such person has engaged, is engaging, or is about to

engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

2.      Venue lies properly within this District pursuant to 7 U.S.C. § 13a-1(e).

3.      The Commission has made a proper *prima facie* showing that from at least at least November 2019 through present (the "Relevant Period"), Traders Domain FX LTD. d/b/a/ The Traders Domain, by and through its officers, employees, and agents, ("TD") and its co-owners Frederick Teddy Joseph Safranko a/k/a/ Ted Safranko ("Safranko") and David Negus-Romvari ("Negus-Romvari"), individually and as controlling persons of TD (collectively, the "TD Defendants") orchestrated a multi-layered scheme to solicit funds for the purpose of trading leveraged or margined retail commodity transactions, specifically gold-to-U.S. dollar pairs ("XAU/USD"), as well as assorted other commodities, through pooled and individual accounts. Many, if not all, of the offered leveraged or margined transactions were transactions described in Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D) ("leveraged or margined retail commodity transactions"). Not only did the TD Defendants directly solicit customers, the vast majority of whom lived in the U.S., but they also engaged other individuals and entities ("sponsors") to solicit U.S. customers on TD's behalf—with each sponsor acting like a spoke extending from the TD hub. During the Relevant Period, the TD Defendants began soliciting individuals and/or entities ("customers") to deposit funds for the purpose of trading XAU/USD and other commodities on a leveraged or margined basis through various account offerings. Starting in January 2021 and continuing thereafter, the TD Defendants also solicited customers for the specific purpose of participating in commodity pool operated by TD (the "TD Pool"). The TD Defendants committed fraud by knowingly or with reckless disregard making oral and written fraudulent and material misrepresentations and omissions, including through the TD website, thetradersdomain.com, on social media, via text messages, email,

2

newsletters, and/or in person in order to persuade potential and existing customers to transfer

funds for the purpose of trading XAU/USD either through TD's various account offerings

or via the TD Pool. TD misappropriated customer funds by accepting customer money via

third party bank accounts, payment processors, and crypto wallets, but failing to use at least

some of those funds to trade XAU/USD and by charging commissions on purported trading

profits that did not exist. In addition, TD, and later it's successor in interest Ares Global

d/b/a/ Trubluefx ("Trubluefx"), misappropriated customer funds by failing to return

customer funds despite repeated attempts by thousands of customers to access and/or

liquidate their accounts. TD and Safranko also falsified trading records and the TD

Defendants failed to register as required under the Act. In an effort to expand the scope of

the fraud, the TD Defendants recruited entities and individuals to act as sponsors and solicit

new customers in exchange for a percentage of purported trading profits in a manner akin to

a multi-level marketing ("MLM") scheme. In addition to the many sponsors spread all over

the United States and internationally, the TD Defendants recruited the "Sponsor Defendants"

(collectively with the TD Defendants and Trubluefx, "Defendants"), four distinct groups

named in the complaint which drove the largest number of customers and funds to the TD

Pool: (i) Algo Capital LLC ("Algo Capital") and Algo FX Capital Advisor, LLC ("Algo FX"),

now known as Quant5 Advisor, LLC, by and through their officers, employees, and agents

(collectively, "Algo"), Robert Collazo, Jr. ("Collazo"), Juan Herman ("Herman"), John Fortini

("Fortini"), and Stephen Likos (Likos) (collectively, the "Algo Defendants"); (ii) Michael

Shannon Sims ("Sims"); (iii) Holton Buggs ("Buggs"); and (iv) Centurion Capital Group, Inc.,

by and through its officers, employees, and agents ("Centurion"), Alejandro Santiestaban

a/k/a Alex Santi ("Santi"), Gabriel Beltran ("Beltran"), and Archie Rice ("Rice") (collectively,

the "Centurion Defendants"). Each group of Sponsor Defendants engaged in a separate

3

fraudulent scheme to solicit customers for the purpose of trading leveraged or margined XAU/USD. Although the Sponsor Defendants each intended the funds they solicited from customers to be traded in the TD Pool, at least some Sponsor Defendants purported to be soliciting for their own pools or "hedge funds." The Sponsor Defendants solicited funds for the TD Pool even though each knew or should have known that TD was not trading the funds as represented. Each of the Sponsor Defendants became aware of red flags that put them on notice that TD was not a legitimate trading operation. The Sponsor Defendants faced a choice: cease promoting TD in light of the alarming information they knew or follow the strong financial motivations they had to ignore the red flags and continue to collect generous commissions on the purported trading. Each of the Sponsor Defendants chose the latter. The Sponsor Defendants actively downplayed the red flags and continued to solicit customers, helping to create the false impression that customers were participating in legitimate trading even as the scheme was on the brink of collapse. Each of Sponsor Defendants knowingly made oral and written fraudulent and material misrepresentations and omissions on social media, via text messages, by telephone, and in person to potential and existing customers that they knew or should have known were false. The Sponsor Defendants misappropriated customer funds, including by accepting funds intended for trading into bank accounts they controlled and/or collecting commissions on customer profits despite that the Sponsor Defendants knew or should have known that TD was not trading the funds as purported. Some of the Sponsor Defendants also commingled customer funds and most were not registered as required under the Act. In the fall of 2022, the scheme began to unravel, and customers began to experience extreme withdrawal delays and/or were unable to withdraw their funds. To persuade customers that the withdrawal issues were not an indication of fraud, the TD Defendants provided numerous, conflicting excuses for the delays—including, in June

4

2023, announcing that TD had been acquired by Trubluefx. The TD Defendants falsely assured customers that their funds were safe and withdrawals would be processed. Notwithstanding the significant withdrawal delays, the Sponsor Defendants ignored or downplayed the withdrawal issues and continued to solicit funds from new and existing customers to be traded in the TD Pool. These misstatements allowed Defendants to continue their fraudulent scheme for more than six months and bilk customers out of millions of additional dollars. Each defendant knowingly or with reckless disregard for the truth engaged in this fraudulent conduct.

4.     Therefore, there is good cause to believe that Defendants have engaged in, are engaging in, or are about to engage in acts and practices in violation of the Act, 7 U.S.C. §§ 6b(a)(2)(A)–(C), 6k(2), 6m(1), and 6o(1)(A)-(B), and Commission Regulations ("Regulations"), 17 C.F.R. §§ 4.20(a)(1), (b)–(c) (2023).

5.     There is also good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for customers in the form of monetary or other redress will occur through the withdrawal, transfer, removal, dissipation or other disposition of funds, assets or other property ("assets") and/or the destruction, alteration or disposition of books and records and other documents ("records") by Defendants, unless Defendants are immediately restrained and enjoined by Order of the Court.

6.     Therefore, there is good cause for the Court to freeze assets owned, controlled, managed or held by Defendants or in which they have any beneficial interest.

7.     There is also good cause for the Court to prohibit Defendants from destroying, altering or disposing of records, and/or denying representatives of the Commission access to inspect records, when and as requested, to ensure that Commission representatives have immediate and complete access to those records.

5

8.    There is also good cause for the appointment of a Temporary Receiver to take control of all
      assets owned, controlled, managed or held by Defendants, or in which they have any beneficial
      interest ("Defendants' Assets"), so that the Temporary Receiver may preserve assets,
      investigate and determine customer claims, determine unlawful proceeds retained by
      Defendants and amounts due to customers as a results of Defendants' alleged violations, and
      distribute remaining funds under the Court's supervision.

9.    There is also good cause to require an accounting by Defendants to the Temporary Receiver
      to determine the location and disposition of customer funds and ill-gotten gains.

10.   There is also good cause to order repatriation of assets controlled by Defendants so that such
      assets can be controlled by the Temporary Receiver and to assure payment of restitution and
      disgorgement as authorized by the Court.

11.   There is also good cause to remove the prohibition on early discovery to enable the
      Commission to determine the full extent of Defendants' wrongdoing (including, but not limited
      to, the possible involvement of others); to locate other customers; to identify and assess
      Defendants' entitlement to funds, assets and other property; and to clarify the sources of funds,
      assets, and other property in advance of a hearing to show cause as to why a preliminary
      injunction should not issue.

12.   In the alternative, for the all the reasons listed above and for the reasons we stated on the record
      during our October 2, 2024, hearing, *see* Sealed Minute Order [ECF No. 9], we find that the
      issuance of a statutory restraining order and appointment of a temporary receiver under 7
      U.S.C. § 13a-1(a) is appropriate because the Commission has satisfied all four elements of the
      traditional test for issuing temporary restraining orders and permanent injunctions. *See Parker
      v. State Bd. of Pardons and Paroles*, 275 F.3d 1023, 1034–35 (11th Cir. 2001) (holding that an
      injunction may be granted where "(a) there is a substantial likelihood of success on the merits;

(b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be averse to the public interest.").

13. In summary, this is a proper case for granting a restraining order *ex parte* freezing assets, allowing inspection of records, appointing a temporary receiver, and granting expedited discovery because the Commission is likely to succeed on the merits. Moreover, there is a reasonable likelihood that Defendants will transfer or dissipate assets or destroy or alter records. For these reasons, we'll **GRANT** the Commission's Motion for a Statutory Restraining Order [ECF No. 5] and **ORDER and ADJUGE** as follows:

## DEFINITIONS

14. For the purposes of this Order, the following definitions apply:

15. The term "assets" encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to: chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all funds, wherever located, whether in the United States or outside the United States.

16. The term "records" encompasses "documents" and "electronically stored information" as those terms are used in Fed. R. Civ. P. 34(a), and includes, but is not limited to, all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or other data compilations—stored in any medium from which information can be obtained or translated,

7

if necessary, into reasonably usable form. The term "records" also refers to each and every such item in Defendants' actual or constructive possession, including but not limited to: (i) all such items within the custody or control of any agents, employers, employees, or partners of the Defendants and; and (ii) all items which Defendants have a legal or equitable right to obtain from another person. A draft or non-identical copy is a separate item within the meaning of the term. A record also includes the file and folder tabs associated with each original and copy.

17. "Defendants" means and refers to, collectively: Traders Domain FX LTD. d/b/a/ The Traders Domain and any and all of its successors in interest, including, but not limited to, Ares Global d/b/a/ Trubluefx; Ted Safranko; David Negus-Romvari; Algo Capital LLC; Algo FX Capital Advisor, LLC, now known as Quant5 Advisor, LLC; Robert Collazo, Jr.; Juan Herman; John Fortini; Steven Likos; Michael Sims; Holton Buggs, Jr.; Centurion Capital Group, Inc.; Alex Santi; Gabriel Beltran; and Archie Rice.

## RELIEF GRANTED

### I. Asset Freeze Order Prohibiting the Withdrawal, Transfer, Removal, Dissipation, and Disposal of Assets

18. Defendants are immediately restrained and enjoined, except as otherwise ordered by this Court, from directly or indirectly withdrawing, transferring, removing, dissipating or otherwise disposing of any assets, wherever located, including Defendants' assets held outside the United States, excepts as provided otherwise in Sections IV, V, and VI of this Order, or as otherwise ordered by the Court;

19. Notwithstanding the provisions of this Section I, at the request of the Temporary Receiver, Defendants and any other person who has possession, custody, or control of any of Defendants' funds, assets, or property shall transfer possession of all assets subject to this Order to the Temporary Receiver in accordance with Section IV, V, and VI of this Order.

8

20. The assets affected by this Order shall include existing assets and assets acquired after the effective date of this Order.

## II. Maintenance of and Access to All Records Relating to the Business Activities and Business and Personal Finances

21. Defendants are restrained from directly or indirectly destroying, altering, or disposing of, in any manner any records that relate or refer to the business activities or business or personal finances of any Defendants.

22. Representatives of the Commission shall be immediately allowed to inspect any records that, in part or in whole, contain, relate, or refer to the business activities or business or personal finances of the Defendants, including, but not limited to, both hard-copy documents and electronically stored information, wherever they may be situated and whether they are in the possession of the Defendants or others. To ensure preservation and facilitate meaningful inspection and review of these records, Defendants shall allow representatives of the Commission to make copies of these records, including complete forensic images of any devices containing any such records, and if on-site copying of these records and/or forensic imaging of these devices is not practicable, representatives may make such copies and/or forensic images off-site. After any such off-site copying and/or forensic imaging, Plaintiff shall promptly return the original documents and devices upon which electronic information is stored.

23. To further facilitate meaningful inspection and review, Defendants shall, absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, promptly provide Commission staff with:

   a. the location of all records relating or referring to the business activities and business and personal finances of the Defendants;

9

        b.      all identification numbers and other identifying information for websites, cloud storage services, email and smartphone accounts, online chat and messaging services, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) owned, controlled or operated by Defendants, or to which the Defendants have access; and

        c.      all passwords to, and the location, make and model of, all computers and/or mobile electronic devices owned and/or used by Defendants in connection with their business activities and business and personal finances.

24.      When inspecting and reviewing records and/or contents of forensic images that are subject to this Order, including those contained on computers and/or other devices, the Commission should undertake reasonable measures to prevent review of the Defendants' privileged communications and/or other nonbusiness, nonfinancial materials by the Commission's attorneys and other staff who are part of the litigation team in this matter. Moreover, Defendants (or their counsel) shall promptly contact Plaintiff's counsel to assert any claims of privilege or other legal objections relating to the inspection and review of any records or contents of forensic images that are subject to this Order and promptly cooperate with Plaintiff's counsel to develop reasonable protocols to isolate and prevent disclosure of claimed privileged and/or other nonbusiness, nonfinancial materials to the Commission's attorneys and other staff who are part of the litigation team in this matter. However, nothing herein shall excuse Defendants from full and immediate compliance with this Court's Order permitting Plaintiff to inspect and review the records and contents of forensic images which relate to Defendants' business activities and their business and personal finances.

10

### III.    Notice to Financial Institutions and Others that Hold or Control Assets or Records

25.    To ensure the effectiveness of the asset freeze and pending further order of this Court, any
        financial or brokerage institution, business entity, or person that receives actual notice of this
        Order and holds, controls, or maintains custody of any account or asset or other property of
        Defendants shall not, in active concert or participation with Defendants, permit Defendants
        or other persons to withdraw, transfer, remove, dissipate, or otherwise dispose of any of
        Defendants' assets, except as directed by further order of the Court.

26.    Any financial or brokerage institution, business entity, or person that receives notice of this
        Order by personal service or otherwise shall not, in active concert or participation with any
        Defendant, directly or indirectly destroy, alter, or dispose of, in any manner, any records
        relating to the business activities and business and personal finances of any Defendant.

27.    Furthermore, any such financial or brokerage institution, business entity, or person that
        receives actual notice of this Order and holds, controls, or maintains custody of any account
        or asset titled in the name of, held for the benefit of, or otherwise under the control of any
        Defendants, or has held, controlled, or maintained custody of any such account or asset of
        any Defendants at any time since November 1, 2019, shall not, in active concert or
        participation with Defendants, deny a request by the Commission to inspect all records
        pertaining to every account or asset owned, controlled, managed, or held by, on behalf of, or
        for the benefit of Defendants, including, but not limited to, originals or copies of account
        applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to
        and from the accounts, all other debit and credit instruments or slips, currency transaction
        reports, 1099 forms, and safe deposit box logs. As an alternative to allowing inspection of
        records, a financial or brokerage institution, business entity or other person may provide
        copies of records requested by the Commission.

11

28. Furthermore, any such financial or brokerage institution, business entity, or person that receives actual notice of this Order shall:

    a. Within ten business days of a request by the Temporary Receiver, or such longer period specified by the Temporary Receiver, provide the Temporary Receiver with copies of all records pertaining to any account or asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendants, either individually or jointly, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs; and

    b. Cooperate with all reasonable requests of the Temporary Receiver relating to implementation of this Order, including transferring Defendants' funds at the Temporary Receiver's direction, and producing records related to business activities or business or personal finances of Defendants to the Temporary Receiver.

## IV. Order Appointing Temporary Receiver

29. Kelly Crawford, Esq., is appointed Temporary Receiver, with the full powers of an equity receiver for Defendants and their affiliates and subsidiaries owned or controlled by Defendants (hereinafter referred to as the "Receivership Defendants"), and all of the funds, properties, premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and other assets directly or indirectly owned beneficially or otherwise, by the Receivership Defendants (hereinafter the "Receivership Estate"). The Temporary Receiver shall be the agent of this Court in acting as Temporary Receiver under this order.

30. The Temporary Receiver is directed and authorized to accomplish the following:

12

a.   Assume full control of the Receivership Defendants by removing Defendants
     Safranko, Negus-Romvari, Collazo, Herman, Fortini, Likos, Sims, Buggs, Santi,
     Beltran and Rice, and any officer, independent contractor, employee, or agent of the
     Receivership Defendants, from control and management of the affairs of the
     Receivership Defendants as the Temporary Receiver deems appropriate;

b.   Take exclusive custody, control and possession of the Receivership Estate, which
     includes but is not limited to complete authority to sue for, collect, receive, and take
     possession of all goods, chattels, rights, credits, money, effects, land, leases, books,
     records, work papers, and records of accounts, including electronically-stored
     information, contracts, financial records, funds on hand in banks and other financial
     institutions, and other papers and records of the Receivership Defendants and
     customers or clients of any of the Receivership Defendants' business activities whose
     interests are now held by, or under the direction, possession, custody or control of,
     the Receivership Defendants;

c.   Take all steps necessary to secure the business and other premises under the control
     of the Receivership Defendants;

d.   Perform all acts necessary, including the suspension of operations to conserve, hold,
     manage, and preserve the value of the Receivership Estate in order to prevent an
     irreparable loss, damage, or injury to any customers or clients of any of Receivership
     Defendants' business activities;

e.   Prevent the withdrawal or misapplication of assets entrusted to the Receivership
     Defendants, and otherwise protect the interests of any customers or clients of any of
     Receivership Defendants' business activities;

13

f.      Manage and administer the Receivership Defendants and the Receivership Estate by
        performing all acts incidental thereto that the Temporary Receiver deems appropriate,
        including hiring or dismissing any and all personnel, suspending operations, and/or
        entering into agreements, including but not limited to: (1) the retention and
        employment of investigators, attorneys or accountants, appraisers, and other
        independent contractors and technical specialists of the Temporary Receiver's choice,
        including without limitation members and employees of the Temporary Receiver's
        firm, to assist, advise, and represent the Temporary Receiver; and (2) the movement
        and storage of any equipment, furniture, records, files, or other physical property of
        the Receivership Defendants;

g.      Collect all funds owed to the Receivership Defendants;

h.      Initiate, defend, compromise adjust, intervene, dispose of, or become a party to, any
        actions or proceedings in state, federal, or foreign court that the Temporary Receiver
        deems necessary and advisable to preserve or increase the value of the Receivership
        Estate or that the Temporary Receiver deems necessary and advisable to carry out the
        Temporary Receiver's mandate under this Order;

i.      Issue subpoenas to obtain records pertaining to the Receivership and conduct
        discovery in this action on behalf of the Receivership Estate;

j.      Open one or more bank accounts and deposit all funds of the Receivership Estate in
        such designated accounts and make all payments and disbursements from the
        Receivership Estate from such accounts;

k.      Make payments and disbursements from the Receivership Estate that are necessary or
        advisable for carrying out the directions of, or exercising the authority granted by, this
        Order, provided that the Temporary Receiver shall apply to the Court for prior

14

approval of any payment of any debt or obligation incurred by the Receivership
Defendants prior to the date of entry of this Order except for payments that the
Temporary Receiver deems necessary or advisable to secure the Receivership Estate
from immediate and irreparable loss; and

l.       Maintain written accounts itemizing receipts and expenditures, describing properties
held or managed, and naming the depositories holding funds or other assets of the
Receivership Estate; make such written accounts and supporting documentation
available to the Commission for inspection; and, within sixty days of being appointed
and periodically thereafter, as directed by the Court, file with the Court and serve on
the parties a report summarizing efforts to marshal and collect assets, administer the
Receivership Estate, and otherwise perform the duties mandated by this Order.

## V.     Accounting and Transfer of Fund and Records to the Temporary Receiver

31. Absent a valid assertion by Defendants of their respective rights against self-incrimination under
the Fifth Amendment, each Defendant shall, within five business days following the service of
this Order:

a.  Provide the Temporary Receiver with a full detailed accounting of all assets, including
the assets inside and outside of the United States that are held by each and every
Defendant, for their benefit, or under their direct or indirect control, whether jointly
or singly, and the location of all records of the Receivership Estate.

b.  Transfer to the territory of the United States and deliver to the possession, custody,
and control of the Temporary Receiver, all records and assets (other than real property)
located outside of the United States that are held by each and every Defendant, for
their benefit, or under their direct or indirect control, whether jointly or singly.

15

c.  Provide the Temporary Receiver access to all records of accounts or assets of the
Defendants held by financial or brokerage institutions located within or outside the
territorial United States by signing any necessary consent forms.

32. Absent a valid assertion by Defendants of their respective rights against self-incrimination under
the Fifth Amendment, Defendants shall, within twenty-four hours of the issuance of this Order
cause to be prepared and delivered to the Temporary Receiver a detailed and complete schedule
of all passwords and identification (ID) numbers for all websites, cloud storage services, email
and smartphone accounts, online chat and messaging services, and all accounts at any bank,
financial institution, or brokerage firm (including any introducing broker or futures commission
merchant) controlled or operated by or to which any of the Defendants have access in
connection with their business activities and business and personal finances.

33. Absent a valid assertion by Defendants of their respective rights against self-incrimination under
the Fifth Amendment, Defendants shall, within twenty-four hours of the issuance of this Order,
cause to be prepared and delivered to the Temporary Receiver, a detailed and complete schedule
of all passwords to, and the location, make and model of, all computers and mobile electronic
devices owned and/or used by Defendants in connection with their business activities and
business and personal finances. The schedules required by this section shall include at a
minimum the make, model and description of each, along with the location, the name of the
person primarily assigned to use the computer and/or mobile device, and all passwords
necessary to access and use the software contained on the computer and/or mobile device.

## VI.  Turning Over Assets and Records to the Temporary Receiver

34. Upon service of this Order, and absent a valid assertion by Defendants of their respective rights
against self-incrimination under the Fifth Amendment, Defendants and any other person or

16

entity served with a copy of this Order, shall immediately or within such time as permitted by

the Temporary Receiver in writing, deliver over to the Temporary Receiver:

   a.  Possession and custody of all assets of the Receivership Defendants, wherever

       situated, including those owned beneficially or otherwise;

   b.  Possession and custody of records of the Receivership Defendants in connection with

       their business activities and business and personal finances, including but not limited

       to, all records of accounts, all financial and accounting records, balance sheets, income

       statements, bank records (including monthly statements, canceled checks, records of

       wire transfers, and check registers), client lists, title documents and other Receivership

       Defendants;

   c.  Possession and custody of all assets belonging to members of the public now held by

       the Receivership Defendants;

   d.  All keys, passwords, entry codes, and combinations to locks necessary to gain or to

       secure access to any of the assets or records of the Receivership Defendants related to

       their business activities and business and personal finances, including, but not limited

       to, access to the Receivership Defendants' business premises, means of

       communication, accounts, computer systems, mobile electronic devices, or other

       property; and

   e.  Information identifying the accounts, employees, and properties or other assets or

       obligations of the Receivership Defendants.

## VII.  Directive To Cooperate with Temporary Receiver

35.  Absent a valid assertion of their respective rights against self-incrimination under the Fifth

     Amendment, Defendants, and all other persons or entities served with a copy of this order shall

     cooperate fully with and assist with the Temporary Receiver. This cooperation and assistance

17

shall include, but not be limited to, providing any information to the Temporary Receiver that
the Temporary Receiver deems necessary to exercising the authority as provided in this Order;
providing any password required to access any computer or electronic files in any medium; and
discharging the responsibilities of the Temporary Receiver under this Order, and advising all
persons who owe debts to the Receivership Defendants that all debts should be paid directly to
the Temporary Receiver.

## VIII. Stay on Actions Against the Receivership Defendants

36. Except by leave of the Court, during the pendency of the receivership ordered herein, the
Defendants and all other persons and entities shall be and hereby are stayed from taking any
action (other than the present action by the Commission) to establish or enforce any claim, right
or interest for, against, on behalf of, in, or in the name of, the Receivership Defendants, the
Temporary Receiver, the Receivership Estate, or the Temporary Receiver's duly authorized
agents acting in their capacities as such, including but not limited to, the following actions:

    a. Petitioning, or assisting in the filing of a petition, that would cause the Receivership
Defendants to be placed in bankruptcy;

    b. Commencing, prosecuting, litigating, or enforcing any suit or proceeding against any
of the Receivership Defendants, or any of their subsidiaries or affiliates, except that
such actions may be filed to toll any applicable statute of limitations;

    c. Commencing, prosecuting, continuing, or entering any suit or proceeding in the name
or on behalf of any of the Receivership Defendants, or any of their subsidiaries, or
affiliates;

    d. Accelerating the due date of any obligation or claimed obligation, enforcing any lien
upon, or taking or attempting to take possession of, or retaining possession of,
property of the Receivership Defendants, or any of their subsidiaries or affiliates or

18

any property claimed by any of them, or attempting to foreclose, forfeit, alter, or
terminate any of the Receivership Defendants' interests in property, including without
limitation, the establishment, granting, or perfection of any security interest, whether
such acts are part of a judicial proceeding or otherwise;

e. Using self-help or executing or issuing, or causing the execution or issuance of, any
court attachment, subpoena, replevin, execution, or other process for the purpose of
impounding or taking possession of or interfering with, or creating or enforcing a lien
upon any property, wherever located, owned by or in the possession of the
Receivership Defendants, or any of their subsidiaries or affiliates, or the Temporary
Receiver, or any agent of the Temporary Receiver; and

f. Doing any act or thing whatsoever to interfere with the Temporary Receiver taking
control, possession, or management of the property subject to the receivership, or to
in any way interfere with the Temporary Receiver or to harass or interfere with the
duties of the Temporary Receiver; or to interfere in any manner with the exclusive
jurisdiction of this Court over the property and assets of the Receivership Defendants,
or their subsidiaries or affiliates.

Provided, however, that nothing in this section shall prohibit any federal or state law
enforcement or regulatory authority from commencing or prosecuting an action against the
Receivership Defendants.

IX. **Compensation for Temporary Receiver and Personnel Hired by the Temporary
Receiver**

37. The Temporary Receiver and all personnel hired by the Temporary Receiver as herein
authorized, including counsel to the Temporary Receiver, are entitled to reasonable
compensation for the performance of duties pursuant to this Order and for the cost of actual
out-of-pocket expenses incurred by them for those services authorized by this Order that when

rendered were: (1) reasonably likely to benefit the receivership estate; or (2) necessary to the administration of the estate. However, the Temporary Receiver and any personnel hired by the Temporary Receiver shall not be compensated or reimbursed by, or otherwise be entitled to, any funds from the Court or the Commission. The Temporary Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty days after the date of this Order and subsequent requests filed quarterly thereafter. The requests for compensation shall itemize the time and nature of services rendered by the Temporary Receiver and all personnel hired by the Temporary Receiver.

## X.   Persons Bound By this Order

38.   This Order is binding on any person who receives actual notice of this Order by personal service or otherwise and is acting in the capacity of an officer, agent, servant, employee, or attorney of the Defendants, or is in active concert or participation with the Defendants.

## XI.   Bond Not Required of Plaintiff or the Temporary Receiver

39.   As Plaintiff Commission has made a proper showing under 7 U.S.C. § 13a-1(b), it is not required to post any bond in connection with this Order. The Temporary Receiver is similarly not required to post bond.

## XII.   Service of Order and Assistance of United States Marshals Service and/or Other Law Enforcement Personnel

40.   Copies of this Order may be served by any means, including via email or facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any records or assets of any Defendants or that may be subject to any provision of this Order.

41.   Alison B. Wilson, Kelly Folks, Sean Hennessy, Sarah M. Wastler, Maura M. Viehmeyer and

20

representatives of the United States Marshals Service are specially appointed by the Court to effect service.

42. The United States Marshals Service is authorized to: a) accompany and assist the Commission representatives in the service and execution of the Summons, Complaint and this Order on the Defendants, and b) help maintain lawful order while Commission representatives inspect records as provided in this Order.

### XIII. Service on the Commission

43. Defendants shall comply with all electronic filing rules and requirements of the U.S. District Court for the Southern District of Florida and shall serve all pleadings, correspondence, notices required by this Order, and other materials on the Commission by delivering a copy to **Alison B. Wilson, Chief Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, D.C. 20581,** by electronic filing, e-mail, personal delivery, or courier service (such as Federal Express or United Parcel Service) and not by regular mail due to potential delay resulting from heightened security and decontamination procedures applicable to the Commission's regular mail.

### XIV. Further Proceedings

44. Good cause having been shown and the burden for issuing a preliminary injunction having been met by the Commission, this Court hereby orders Defendants to show cause why a Preliminary Injunction should not issue. The Order to Show Cause is set for hearing for **October 29, 2024, at 2:00 p.m. in Courtroom 12-4** at the United States Courthouse for the Southern District of Florida, 400 N. Miami Ave, Miami, FL 33128. Should any party wish to file a memorandum of law or other papers concerning the issuance of a preliminary injunction against the Defendants, such materials shall be filed, served, and received by all parties at least two full days before the hearing ordered above.

21

45. Plaintiff's request for expedited discovery is also granted. In advance of the hearing to show cause as to why a preliminary injunction should not issue, the parties may conduct expedited discovery, and the prohibition upon discovery before the early meeting of counsel pursuant to Rule 26(f), in accordance with Rule 26(d), is removed. Depositions of parties and non-parties may be taken subject to two calendar days' notice pursuant to Rule 30(a) and 45, that notice may be given personally, by facsimile, or by electronic mail, and, if necessary, any deposition may be taken remotely.

## XV. Force and Effect

46. This Order shall remain in full force and effect until **October 29, 2024**, unless extended further by order of this Court by order of this Court. This Court retains jurisdiction of this matter for all purposes.

**DONE AND ORDERED** in the Southern District of Florida on October 3, 2024.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**